[No. 22589. Department Two. January 20, 1931.]

WILLAPA ELECTRIC COMPANY, *Appellant*, v. PACIFIC COUNTY *et al.*, *Respondents*.[1]

*Theodore B. Bruener* and *Welsh & Welsh*, for appellant.

*Herman Murray*, for respondents.

BEELER, J.—The Willapa Electric Company, as plaintiff, instituted this action in the superior court for Pacific county to enjoin respondents from collecting taxes levied against its street railway property for the years 1926 and 1927, and to compel the county treasurer to accept its tender in full payment of the tax, and to cancel all taxes in excess thereof. The essential facts may be stated as follows:

Plaintiff, a domestic public service corporation, continuously since 1913, has been and still is the owner and operator of a street railway within and between the cities of South Bend and Raymond, Washington; that its property consists of approximately five and a half miles of track within the corporate limits of South Bend and Raymond, except about one and a half or two miles thereof situated on the county high-

[1]Reported in 295 Pac. 152.

way connecting the two cities, together with all necessary overhead trolley and feeder wires, three passenger cars, two of which are equipped with air brakes, and the other with a hand brake, all old and obsolete, one tower car used for repair work, miscellaneous tools, spare parts, and four lots of real estate in the city of Raymond, on which the company has its old car barn; that this street railway system has no private right of way, the tracks being located on city streets and on the county highway; that in 1913, at the time plaintiff started to operate its railway, and for some time thereafter, there was no means of transportation between South Bend and Raymond, except by an old crooked plank roadway or by boat on a river. Later, however, a paved highway was constructed between the two cities, the effect of which was to reduce tremendously the earnings of the railway; that its net earnings increased materially from 1913 to 1918, and then started on the decline, resulting in a deficit of $2,044.99 in 1925, a deficit of $246.54 in 1926, and a deficit of $7,544.35 in 1927, and a deficit of $6,574.70 in 1928. Since 1924, the population of both cities has decreased somewhat and, furthermore, there has been a substantial exodus of manufacturing plants and sawmills from both cities and adjacent territory.

The state board of equalization for each of the years 1926 and 1927 fixed the one hundred per cent valuation of the street railway at $90,000, and the assessed valuation, based on a ratio of forty-eight per cent for 1926 at $43,200, and based on a ratio of forty-seven per cent for the year 1927, at $42,300, and levied a tax of $3,364.58 against the property for 1926, and $3,204.47 for the year 1927. On March 15, 1927, appellant tendered the sum of $850.39, and on March 13, 1928, the sum of $770.18 to the county treasurer of Pacific county, in full payment of what it considered

to be a fair tax for the years 1926 and 1927, respectively. The county treasurer rejected both tenders, and, thereafter, plaintiff instituted this action. The trial court reduced the valuation from $90,000 to $30,000, and fixed the tax at $1,121.53 for 1926, and $1,068.16 for the year 1927, and entered judgment accordingly. Plaintiff, still feeling aggrieved, has appealed.

The court's finding No. 5 is in part as follows:

"That the assessment of the street railway lines of the said plaintiff so made by the state board of equalization was made arbitrarily and fraudulently, and the value placed upon said street railway lines by the state board of equalization was, and is, grossly excessive and inequitable and much higher proportionately than other like property."

This finding is amply supported by the evidence. Judgment was entered thereon, and respondents prosecuted no appeal therefrom. Therefore, it being established that the assessed valuation as made by the state board of equalization was excessive and inequitable, the only question presented for our determination is whether the valuation of thirty thousand dollars as fixed by the trial court, is fair, just, and correct.

The reasons assigned by the court in fixing the valuation of the property, including the franchise, at thirty thousand dollars, can be best understood by reviewing the entire memorandum opinion rendered at the close of the case:

By the court:

"In this case, which seems to be an extreme case, it differs from a good many of the cases that get into court. I can see that in case of a going concern paying perhaps five or six per cent interest, or four or two per cent interest was a going profitable concern, that the court might consider cost and reproduction

costs and bonded indebtedness, and so on as affording kind of a sidelight on the value of the property. In this case, I do not consider as applicable all of the bookkeeping testimony as to cost and outstanding bonds and stock issued and stock authorized. It runs up into the millions, I believe, but I do not think is much if any indication of the value of the property in view of the other features of the situation.

"Here we have a railway that during the years in dispute was operating at a loss. Now this railway according to the testimony has been operating since about 1911 and did not begin to be operating at a loss until 1925, and *it is evident has been operating at a loss in 1925, 1926 and 1927. If we knew it was always going to be operated at a loss, in which event the operation would have to be discontinued, why it would be valued at strictly salvage value. That is all the property would be worth.* Now, it may be in time that condition will have to be reached. It may not be many years, but in view of the testimony it has been operating successfully for a good many years, and it is in evidence that there is a period of depression on Willapa Harbor for the last two years and the taxes should be reduced for that reason. I do not think the conclusion should yet be adopted that it may never be any better. We have a right at least to catch the Seattle spirit if we can, and Aberdeen and the other places and go forward. We have resources which would justify the development of this country, and I am not willing to assume that we are always going to drag on the bottom in the same condition we do now.

"I am of the opinion that for this reason the franchise of this company has to be taken into consideration in fixing the value. Now you could not get more than fifteen thousand dollars for this salvage value under the testimony, and here it is assessed at ninety thousand dollars. Now what should be the value of the franchise or the right to keep these streets and grounds in the hopes that something will transpire to produce more favorable business conditions? *It may be before long we will get some first class industries in here, we certainly have large natural resources, and*

*if we can only change our luck, we will go forward successfully I think.* Whether we will or not we cannot tell but I do not think the time has yet arrived to say absolutely that we cannot. Of course it is apparent under the evidence that ninety thousand dollars is too much as the valuation of this property for the years 1926 and 1927. Neither do I think the salvage value is the true valuation. I am disposed to add to the salvage value about a sum sufficient to bring the total value for the years named of the line to thirty thousand dollars each, or an assessed valuation of forty-eight per cent, I think the rate is, and you can calculate accordingly. The tax will be reduced to a total valuation or a gross valuation from ninety thousand dollars to the sum of thirty thousand dollars, and for future years, we do not have to litigate that now. If times keep on there will have to be a further reduction, and ultimately to a salvage valuation; but I do not think we should be in any haste to give up our chance of existence here.''

The court, in its opinion, recognized the value of the street railway property, exclusive of the franchise, did not exceed fifteen thousand dollars. Therefore, it is apparent the court placed a valuation of fifteen thousand dollars on the franchise based on two facts or circumstances: First, that the street railway was operated at a profit from 1913 to 1924, inclusive; and second, the hope that business conditions in and about Pacific county might improve in the future. It is very clear that, in fixing the valuation of the property, including the franchise, at thirty thousand dollars, the court did not limit nor confine its calculations to the actual value of the property at the time the assessment was made as the law requires, but indulged in the speculative hope that new industries might be induced to locate in Pacific county in the future, and, as a result, the economic conditions of the community would improve. The law, however, is well settled that

property shall be assessed at its *fair market value at the time the assessment is made.*

A well considered case is that of *Cumberland Pipe Line Co. v. Lewis,* 17 Fed. (2d) 167:

"No matter what the income of a franchise corporation may have been in the past, if it is a certainty that it will have none in the future, its entire belongings will bring nothing at a fair voluntary sale, except for wreckage purposes, and there can be no franchise for assessment. Anyone purchasing property, valuing it from a commercial point of view, will be governed by the probable net income which will arise therefrom in the future."

To the same effect is the case of *State v. Central Pacific R. Co.,* 10 Nev. 47:

"If the road does not pay current expenses, and cannot be expected to do so, then it is worth no more than the value of its movable material, less the cost of taking it up and getting it to market."

This court has repeatedly announced the same rule. In the case of *Metropolitan Building Co. v. King County,* 62 Wash. 409, 113 Pac. 1114, Ann. Cas. 1912C 943, we said:

"The value of the term is fixed with reference to present as well as prospective conditions; not speculative, but actual; or, to state the proposition more aptly, its value in money to one who desires to sell but who is under no necessity for selling, and to one who is desirous of buying but is under no compulsion to do so."

In *Case v. San Juan County,* 59 Wash. 222, 109 Pac. 809, the assessor placed a valuation of approximately fifty thousand dollars on property, because certain parties agreed to pay fifty thousand dollars for the property, provided the owners would spend six or seven thousand dollars in development work and prove and demonstrate that there was sufficient limestone

to supply a cement plant of the capacity of one thousand barrels a day for twenty-one years. We held that the cash value of the property, according to the testimony, was not to exceed fifteen thousand dollars, and held that the theoretical value, based on possible conditions, was not a proper value for assessment purposes, and that such assessment constituted constructive fraud. The following cases are to the same effect:

*Metropolitan Building Co. v. King County,* 64 Wash. 615, 117 Pac. 495; *Metropolitan Building Co. v. King County,* 72 Wash. 47, 129 Pac. 883; *Finch v. Grays Harbor County,* 121 Wash. 486, 209 Pac. 833, 24 A. L. R. 644; *Inland Empire R. Co. v. Whitman County,* 128 Wash. 358, 223 Pac. 6.

The question then is, What was the fair market value of this street railway system in 1926 and 1927? The fact is established, beyond cavil, that the income realized from the operation of the property for each of these years was insufficient to pay operating expenses. From 1925 to 1927, inclusive, the deficit was constantly on the increase. In fact, the same applies for the year 1928, the deficit for that year being $6,544.70. Appellant produced several expert witnesses, all of whom, by experience and training, were admirably qualified to express an opinion as to the value of the franchise, the actual value of the property, and also as to its future prospects as an operating enterprise. They all testified that the property, for the years 1926 and 1927, had merely a salvage value of approximately fifteen thousand dollars; that the franchise had no value; that they saw no prospect for the company to earn operating expenses in the future, by reason of being subjected to the ever increasing competition of automobile travel.

The soundness of this testimony stands unassailed and unquestioned. The record discloses that this railway suffered tremendously, by reason of automobile traffic on the macadamized highway paralleling the line. This competition became more damaging as automobile traffic increased. Nor would the bringing of new industries into Pacific county alter the situation. The evidence establishes the fact, and experience confirms it, that the traveling public prefers swift-moving easy-riding automobiles to slow-moving noisy street cars. The trial court failed to give due weight to this inexorable fact. The effect of this kind of competition on a street railway is tersely and aptly stated by Judge Fullerton in the dissenting opinion in *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366:

"When street railways were first put in use, and for a long time thereafter, they were the sole means of transportation. Now they have an indirect competition against which there is no protection, whether publicly or privately owned. Business and professional men generally, and many mechanics and artisans, who formerly patronized the street cars, now ride to and from their homes and their places of work in their own conveyances. Private conveyances are now the adjuncts of many homes; the members of which, who formerly patronized the street cars, now ride altogether in such private conveyances. One has but to glance at the streets of any considerable city to know that the loss of patronage arising from these causes has made large inroads into the revenues of street railway systems. It is a competition that will increase rather than diminish as time goes on, and the loss of patronage caused thereby, as I understand the situation, is the principal reason why so many street car systems are now unable, with reasonable rates of fare, to make an adequate return on their investments."

Clearly, the record does not support the finding that the franchise had a valuation during the years 1926

and 1927 of fifteen thousand dollars, but on the contrary incontrovertibly establishes the fact that, from 1925 to 1928, inclusive, the franchise had no value whatsoever.

But respondents contend that appellant, in addition to operating its street railway system, for many years had owned and operated, and still owns and operates, an electric light and power plant, furnishing light and power to the citizens of South Bend and Raymond, and that both of these enterprizes are handled by the same executive officers; and respondents further contend that the established facts are that all the moneys derived from the operation of these two enterprizes were placed into a common fund, and disbursed therefrom indiscriminately in payment of interest, taxes and overhead charges, and various other items. Unquestionably, the facts are as respondents claim. But that does not alter the conclusion we have reached, for the obvious and sufficient reason that the board of equalization, in fixing the valuation of the street railway system at ninety thousand dollars, did so without reference to the property of the light and power plant. Each one of these enterprizes, the street railway system, and the light and power plant, is operated under a separate franchise, and the assessed valuation of each one was determined and fixed separate and independent of the other.

We find the sum of $850.39, and the sum of $770.18, tendered by appellant to the county treasurer in payment of taxes for each of the years 1926 and 1927, to be fair and equitable, and, therefore, the judgment of the trial court is reversed with directions that the Pacific county treasurer accept these amounts and cancel all taxes levied in excess thereof. Appellant shall pay interest on the respective amounts tendered

from the date when each tax became due. Appellant is allowed its costs.

MITCHELL, MILLARD, BEALS, and FULLERTON, JJ., concur.