## No. 19,666.

### The Colorado & Utah Coal Company *v.* Cecil Rorex, Clerk of the Board of County Commissioners of Routt County, et al.

(369 P. [2d] 796)

Decided March 19, 1962.

Messrs. HOLME, ROBERTS, MORE and OWEN, for plaintiff in error.

Mr. ROBERT H. GLEASON, for defendants in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

THE Colorado & Utah Coal Company was plaintiff in a suit concerning the 1958 assessment for tax purposes of certain personal property and improvements on the real estate of the Company. The Company contends that the valuation of all this property for tax purposes should have been $45,000.00, whereas the County Assessor valued the property at $335,030.00. The tax levied was based upon the latter figure.

Having pursued its administrative remedies to an unsuccessful conclusion, the Company thereafter sought relief in the district court by review proceedings under C.R.S. '53, 137-3-38. Trial there resulted in a judgment

affirmative of administrative action, and hence adverse to the Company. Persisting in its contention that the tax on the property involved was manifestly erroneous, oppressive, and confiscatory, the Company is before us seeking reversal by writ of error.

As grounds for reversal, the Company contends that the trial court committed prejudicial error —

(1) In holding that the integrity of the presumption of regularity of the Assessor's action in evaluating the property remained intact in the face of admissions and evidence depriving the presumption of any force;

(2) In not finding and determining the assessments to have been manifestly erroneous and oppressive;

(3) In construing the pleadings as limiting the issue to alternative values: either that asserted by the Company or that fixed by the Assessor; and

(4) In failing to exercise its statutory authority to ascertain the value of the property and thereupon modify the erroneous assessment to conform to such value.

The Company was incorporated in 1914, and afterwards commenced its coal operations at Mt. Harris, Colorado. It continued to mine coal until January 31, 1958, after which operations were confined solely to the proper liquidation of the business and the due dissolution of the corporation. During its existence the Company owned an underground mine and tipple north of the Yampa River, and the Company town and store south of the river. A company-owned bridge connected the mine with the town.

After 1948 a palpable decline in profits from the Mt. Harris operation appears from the records of the Company, and this condition was indicative of the fact that the Company was in the throes of death. In 1948 the Company had realized a net profit of $490,754.92. A marked decrease in profits followed until 1954, when it sustained a loss of $14,675.92. The next year the Company realized a small net profit of $13,249.45, but in 1956

it suffered a loss of $6,285.91, and in 1957 a loss of $40,841.76.

At the annual meeting of stockholders, held in April 1955, it was proposed that serious consideration be given to the "cessation of operations" and "the prompt liquidation of" the Company. The critical condition of the Company was again discussed at the annual meeting for 1957. A special meeting of directors was held November 18, 1957, at which it was resolved to submit to the stockholders a plan of liquidation. On January 20, 1958, at a special meeting of stockholders, a plan of liquidation was proposed and approved.

The Company made a return of its tax schedule for the year 1958, and placed a value of $55,800.00 on its properties. This value was rejected by the County Assessor, who fixed a valuation of $346,550.00 on these properties, a substantial reduction from the 1957 valuation of $380,560.00. The date of the assessment in question was February 1, 1958, at which time the mine properties were intact. Taxes based on this assessment were paid under written protest.

In determining appraisals for taxation, the 1941 replacement cost of machinery and equipment was the factor considered. A depreciation formula was then applied. In March or April 1958, Winkleman, the industrial appraisal engineer for the Colorado Tax Commission, visited the Mt. Harris property of the Company for the purpose of appraising it, and his valuations were adopted by the County Assessor.

According to Winkleman, management of the Company, obsolescence, or the fact that the Company was part of a very sick industry were not factors which he took into account in making his appraisals. He testified that "in order for relief to be given there must be several years of notification to the Assessor that the property is in distress." And then, obsolescence would only be recognized when supported by ample evidence showing that it existed.

Both the Assessor and Winkleman admitted that an official manual existed containing directions for evaluating property for tax purposes, and that obsolescence was treated extensively therein. (Concerning the manual's significance — whether issued pursuant to, or containing directions in accordance with, law — we are not here deciding.) On cross-examination of these witnesses, they admitted that obsolescence was not considered in their decisions as to value. Further, on cross-examination, excerpts of the manual were used in framing questions to Winkleman, and his answers negated resort to the criteria therein given, relating to obsolescence, in his appraisals.

Other factors were not given any weight by the assessing authorities. That the property was located in a coal camp in the process of being abandoned was deemed insignificant. Comparable sales were disregarded. Either impliedly or expressly, these factors were proposed for consideration in the manual in placing value on property.

Pursuant to the plan of liquidation, the Company negotiated for the sale of its assets. Several dealers bargained for them. Eventually the assets, except the land and except some equipment sold to another coal company for $11,839.35, were transferred to J. B. Wise, Inc. for $107,235.00. The latter company removed machinery and equipment from the mine, and these, together with buildings, machinery, and equipment on the surface, were sold by it mostly at auction and some at private sale for a total of $228,347.00.

Whatever other evidence need be mentioned will be recited under the particular point being discussed and to which it has significance. We consider the several points in the order enumerated above.

1. In its "Memorandum of Decision," the trial court invoked the rule that the "Assessor's valuation is attended by the usual presumption that the act of a public official or public body is regular and lawful." Noting the

substantial decrease in the 1958 valuation from the prior year, the trial court observed that it "was in conformity with the 1952 directive. Winkleman so testified and there is no refutation. Presumptively the reduction *included and encompassed all factors* properly to be taken into consideration. *This presumption has not been overcome.*" (Emphasis supplied.)

■ It is true that an assessor's ascertainment of the value of property for taxation is presumed to be right. *Standard Chemical Co. v. Curtis,* 77 Colo. 10, 233 Pac. 1112; *Tax Commission v. Midland Terminal Railway Co.,* 93 Colo. 108, 24 P. (2d) 745. The efficacy of this presumption is such that clear and convincing evidence must be adduced to enervate it. *Tax Commission v. Midland Terminal Railway Co.,* supra; *Stalder v. Board of County Comm'rs,* 147 Colo. 493, 364 P. (2d) 389.

Should the presumption prevail, however, where those assessing officials who would avail themselves of it admittedly had not taken obsolescence and other sales into consideration in fixing values?

"In determining the true value of taxable property * * * *market value* shall be a guide." (Emphasis supplied.) C.R.S. '53, 137-3-17. The value thus designated is simply and in essence the value which property has in exchange for money in a free market. *Kistler v. Water District,* 126 Colo. 11, 246 P. (2d) 616. It has been said many times that such value involves voluntary dealing between buyer and seller at a price the former is willing to pay and the latter is willing to take. See *Wassenich v. Denver,* 67 Colo. 456, 186 Pac. 533; *Commissioners v. Noble,* 117 Colo. 77, 184 P. (2d) 142.

Opinion evidence regarding market value should be based upon the same elements as would induce willing and intelligent buyers and sellers to agree, including such sources of information as the contracting parties would use. Obsolescence would be an important factor in the make-up of such market value. *Assessors of*

508

*Quincy v. Boston Consol. Gas Co.*, 309 Mass. 60, 34 N.E. (2d) 623. Indeed, one who is anxious to buy but who would disregard obsolescence, when at hand, would be deemed foolhardy, and his purchase would likely prove to be a pig in a poke.

█ The force of the presumption of regularity of the Assessor's official act must be regarded as spent when he and his witness Winkleman admittedly did not take into consideration obsolescence as it was made to appear in this case. With or without a manual containing directions to take obsolescence into account, it is, when present, a constituent of valuation for taxation. In this state, in order to achieve as nearly an ideal or perfect uniformity and equality in taxation as human fallibility permits, assessors were supplied with manuals which furnished them with guides for determining valuations for tax purposes.

"No party can claim the right of a presumption against his own admission under oath." *Braselton v. Vokal,* 53 Calif. App. 582, 200 Pac. 670. The force of a presumption is exhausted "when a fact which is wholly irreconcilable with it is proved by the uncontradicted testimony of the party relying on it * * *, when such testimony is not the product of mistake or inadvertence." *Bard v. Kent,* (Cal. App. 116 P. (2d) 137, affirmed, 19 Cal. (2d) 449, 122 P. (2d) 8.

There had been other sales of like properties, a number of which involved properties of the Company, within recent times. Assessor and Winkleman acknowledged that these sales were disregarded in the formation of values. Sales are frequently a criterion in placing a value on property. *Wassenich v. Denver,* supra. To ignore them in the circumstances here present adversely affected the strength of the presumption upon which the trial court relied.

█ Confronted with judicial admissions at variance with the presumption, the trial court should not have

presumed that "the reduction included and encompassed all factors properly to be taken into consideration," and it should not have decided that the presumption had not been overcome. If obsolescence was present (a question we next resolve), by admission it was not treated as a factor in evaluating the properties. Nor were other sales considered.

2. Obsolescence or functional depreciation, if proven, should have had an important bearing on the establishment of value. Once obsolescence becomes manifest, any decision as to value requires due allowance for such, as an ingredient of correct value. *Standard Oil Co. v. Glander,* 155 Oh. St. 61, 98 N.E. (2d) 8, rev. on other grounds, 342 U.S. 382, 72 S.Ct. 309, 96 L.Ed. 427.

Regardless of terminology, whether designated obsolescence or functional depreciation, we are not resolving something novel in the law. The presence or absence of obsolescence enters into valuation, whatever the field of law, where the value of property has importance. This is as true of values for purposes of taxation as it is in condemnation cases, confiscation cases, and generally in controversies involving the ascertainment of just compensation. *Great Northern Ry. Co. v. Weeks,* 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532.

That functional depreciation is a component of value has too wide an acceptance to consider it only as a subject to be expounded by theoreticians. Its practical application under varying circumstances proves its essentiality where it affects value. *Real Estate-Land Title & Trust Co. v. United States,* 309 U.S. 13, 60 S.Ct. 372, 84 L.Ed. 542; *State Line & Sullivan R. Co. v. Phillips,* 17 F.S. 607; *Guaranty Trust Co. v. Grand Rapids G.H. & M. Ry. Co.,* 7 F.S. 511; *Attorney General v. Trustees, Etc.,* 319 Mass. 642, 67 N.E. (2d) 676; *Assessors of Quincy v. Boston Consol. Gas Co.,* supra; *Hackensack Water Co. v. Division of Tax Appeals,* 2 N.J. 157, 65 A. (2d) 828; *People ex. rel. Penn. Tunnel & Terminal R. Co. v. Miller,*

26 N.Y.S. (2d) 232; *People ex rel. City of New York v. Barker,* 17 N.Y.S. (2d) 305; *Rollman & Sons Co. v. Board of Revision,* 163 Oh. St. 363, 127 N.E. (2d) 1; *Standard Oil Co. v. Glander,* supra; *B. F. Keith Columbus Co. v. Board of Revision,* 148 Oh. St. 253, 74 N.E. (2d) 359.

What is obsolescence or functional depreciation? "Webster defines 'obsolescence' as a condition or process of gradually falling into disuse. In its ordinary application it refers to what has been termed 'functional depreciation' which results from the necessary replacement of equipment, before it is worn out, by reason of invention and improved appliances which render more efficient and satisfactory service." *Guaranty Trust Co. v. Grand Rapids G. H. & M. Ry. Co.,* supra.

In the last cited case an interurban railway became worthless "for want of patronage." After giving the above quoted definition of obsolescence, the court went on to say that such would represent an "internal type" of functional depreciation, and that loss of value arising from a lack of patronage would be a type of external obsolescence, observing that "this external obsolescence may, as stated in the above quotation, come suddenly, or its approach may, in other cases, be apprehended. Its effect, in any event, is to substantially diminish values."

"Obsolescence" was defined by the Supreme Court of the United States in *United States Cartridge Co. v. United States,* 284 U.S. 511, 52 S.Ct. 243, 76 L.Ed. 431. The court said that it "may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory loss, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value." See *Attorney General v. Trustees of Boston El. Ry. Co.,* supra; *People ex rel. Penn. Tunnel & Terminal R. Co. v. Miller,* supra.

It can thus be seen that obsolescence results from an evolutionary process in which business is subject to

changing economic conditions. These conditions "cause or contribute to the relentless march of physical property to the junk pile." *S. S. White Dental Mfg. Co. v. United States*, 38 F.S. 301. We would consider some of the conditions enumerated in the above definitions.

*Changes in the art.* There was considerable testimony concerning strip coal mining in Routt County and elsewhere against which underground mining could not compete. It was a less costly operation and could adequately supply such demand for coal as existed. This testimony was undisputed.

*Loss of trade.* Much evidence related to the plight of the Company in particular and the coal business in general. The coal industry had fallen on dark days, and the Company was in as bad condition as the industry generally. The books of the Company revealed that it was an ailing business. How long the Company would have struggled to live had not its death been brought about through voluntary action would be conjectural, but there was no question that it was a sick business.

Competition from strip mining, use of gas instead of coal for heat, and diesel-operated motors instead of steam engines by the railroads, all had a deadly effect upon the Company's business. And the coal industry generally suffered from the competitive fuels. Again, there was no contradictory evidence.

Not only was there testimony disclosing the plight of the coal industry, but the trial court could have taken judicial notice of the fact. Courts take judicial notice of the depressed condition of the coal mining business. *Morris-Poston Coal Co. v. Commissioner of Internal Revenue*, 42 F. (2d) 620. This court has taken judicial notice of economic conditions which are generally known. *McNichols v. Denver*, 101 Colo. 316, 74 P. (2d) 99; *El Jebel Shrine Ass'n v. McGlone*, 93 Colo. 334, 26 P. (2d) 108.

*Other things.* The State Coal Mine Inspector testified that the machinery at Mt. Harris was obsolete. He also

stated that because of changes in *mining regulations* much of the equipment had a very limited possibility for use elsewhere. Machinery and equipment become obsolescent when they fall under the ban of "some governmental ruling." *Attorney General v. Trustees of Boston El. Ry. Co.,* supra. Too, it was a mine in the process of being closed because of the necessities of its situation.

Comparable cases appear in the reports. We have already recited enough facts of the case of *Guaranty Trust Co. v. Grand Rapids G. H. & M. Ry. Co.,* supra, to show its application to the present case. One other case is most helpful. A theater built for vaudeville performances had dressing rooms and waiting rooms which lost their usefulness when vaudeville became passé. These rooms were held to "have become subject to what is known as functional depreciation" in *B. F. Keith Columbus Co. v. Board of Revision,* supra.

 Our review of this record convinces us that obsolescence was an important factor which should have been considered by the Assessor in performing his function of evaluating the property for taxation. It was a factor on the date of assessment, and the Assessor was concerned then with the value for taxation. Valuation at the time of assessment is controlling, and testimony to the effect that obsolescence becomes cognizable only after several years of existence and presentation to the taxing authorities should have been disregarded, since such a rule has no sanction in the law. *People ex rel. City of New York v. Barker,* supra; *Standard Oil Co. v. Glander,* supra; *Willapa Electric Co. v. Pacific County,* 160 Wash. 412, 295 Pac. 152, amended on other grounds, 164 Wash. 712, 2 P. (2d) 724.

 This very case presented to the Assessor, the Board of Equalization, and the trial court, successively, the prime factor in resolving value — obsolescence. Rejection on the theory that, although a reality, obsolescence had to exist and be proved to have existed for

several years before it could be taken into consideration by the taxing authorities is ultra vires action by such officers. Whenever obsolescence becomes known to the Assessor, whether through his efforts or through those of others, it should be a component of the value of the item to be assessed.

3. Holding as we do that obsolescence affected the value of the Company's properties, was the trial court strait-jacketed by the pleadings to alternative values: either that of the Assessor or that of the Company? The trial court believed itself so limited, for it said:

" * * * The issue, as defined by plaintiff on page 2 of its brief, is whether the property had a 1958 value for tax purposes of $38,744.00 as asserted by the Company or a value of $355,030.00 as asserted by the County or as a third alternative, 'had some intermediate value.' Merely to find that there was an undetermined intermediate value would be useless. The Court would have to fix such value.

"To this latter method there are insuperable objections:

"1. The Court has no jurisdiction or authority to assess property for taxation.

"2. It has neither the means nor the skill necessary for the purpose.

"3. No scheme or plan nor an ultimate figure for this intermediate value is offered in the pleadings, evidence or briefs.

Eliminating the third alternative *the issue is as stated.*" (Emphasis supplied.)

There are two reasons why the issue should not have been so narrowed. Although they are interrelated, either is sufficient to have permitted the trial court to hold that an intermediate value should have been set.

First, the complaint alleged both specifically and generally that the Company had been taxed erroneously, excessively, oppressively, and in a confiscatory manner.

Secondly, the case was tried on the apparent theory that an unlawful assessment had been made and evidence adduced on that theory. It certainly was not tried on the theory that one or the other of the two valuations was the narrow issue confronting the trial court.

■ We hold that, under the circumstances, the issue before the court was more than alternative values; that before it was the question of an allegedly invalid assessment. *Weick v. Rickenbaugh Co.*, 134 Colo. 283, 303 P. (2d) 685.

4. Since the trial court could have determined that a value different from that proposed by the Company or set by the Assessor should have been found and fixed by the latter, was it authorized to settle what the assessment should be?

We agree with the trial court that it had no such authority. It could only determine that the assessment was manifestly erroneous, excessive or confiscatory. Having decided that, it would remand the matter to the taxing authorities with directions to find the "true value" and assess accordingly. *Denver v. Lewin,* 106 Colo. 331, 105 P. (2d) 854; *Tax Commission v. Midland Terminal Railway Co.,* supra. "The court has no authority to make an assessment or fix a valuation." *Denver v. Lewin,* supra.

The Assessor had the duty of determining the values of properties as they existed on the date of the assessment. All the factors for ascertaining the market value of an intact, but liquidating mining operation were accessible to him and the duty so to do was his.

The judgment is reversed, and the cause remanded with directions to the trial court to find that the assessment was manifestly erroneous, excessive and confiscatory and having so found shall remand the matter to the taxing authorities with directions to find the true value of such property and assess the same in accordance with the statute and this opinion. Upon such reassessment the trial court shall enter judgment in favor of the plaintiff

and against the defendants for the amount by which the tax heretofore paid exceeds the tax properly levied upon such assessed value, together with interest and costs in accordance with the provisions of 1953 C.R.S., Section 137-3-38, less any amount of interest which has been waived by stipulation executed by plaintiff.