CARRARA PLACE, LTD.; Marin Partners, Ltd.; M–B Orchard Falls, Ltd.; Tuscany Associates; Triad Associates and Plaza Colorado, Ltd.; Orchard Associates III L.P.; First Interstate Bank of Denver, N.A.; Allstate Insurance Co.; Park Place Associates, Ltd.; Kroh Brothers Development Company; State of California P.E.R.S.; (Great–West Life Assurance Company), The Great–West Life Assurance Company; Jay C. Roulier and Bill Walters; Plaza Colorado, Ltd.; Travelers Insurance Company; Glendale Office Building, Ltd.; Linclay Corp.; Tower I Venture, Ltd.; and Meyer and Lillian Blinder, Joint Tenants, Plaintiffs–Appellants,

v.

ARAPAHOE COUNTY BOARD OF EQUALIZATION, Defendant–Appellee,

Mary Anne Maurer, Property Tax Administrator, Intervenor.

No. 86SA341.

Supreme Court of Colorado, En Banc.

Sept. 12, 1988.

Daniel H. Israel, P.C., Daniel H. Israel, Denver, for plaintiffs–appellants.

Peter Lawrence Vana, III, Arapahoe County Atty., Littleton, Stern & Heiser, James E. Heiser, Denver, for defendant–appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Larry A. Williams, First Asst. Atty. Gen., Denver, for intervenor.

ROVIRA, Justice.

Appellants (taxpayers) challenge the Arapahoe County Assessor's valuation of commercial properties they own in and near the Denver Tech Center. The Arapahoe County Board of Equalization (Board) upheld the Assessor's valuations, and the district court in turn affirmed the Board's decision. We affirm.

Taxpayers contend first, that the Assessor erred by failing to take into account 1985 economic conditions in appraising the properties; second, that the applicable statutes are unconstitutional to the extent that they do not permit the assessor to consider such conditions; and third, that the assessor's valuations for assessment and the Board's affirmation of those assessments suffer from a number of substantive and procedural defects.

## I.

### A.

On June 24, 1985, taxpayers filed protests to their respective 1985 property valuations with the Arapahoe County Assessor (Assessor). § 39–5–122(2), 16B C.R.S. (1987 Supp.). They asserted that the Assessor failed to consider 1985 economic

data in making his appraisals, and that as a consequence the valuations for assessment were excessive and not equalized. In addition, each protest offered an alternative valuation based on appraisals made by a professional appraiser. The Assessor denied the protests on the grounds that "[t]he data presented by [taxpayers] is [sic] inappropriate and does not justify adjustment of the 1977 level of value."

Taxpayers then petitioned for review of their properties' assessed values before the Board.[1] § 39–8–106(1), 16B C.R.S. (1982 & 1987 Supp.). The petitions were consolidated and an extensive three-day hearing was held during July 1985. See § 39–8–107(1), 16B C.R.S. (1982). The Board subsequently denied the petitions and allowed the Assessor's valuations for assessment to stand.[2]

Taxpayers appealed the Board's order to the Arapahoe County District Court, see § 39–8–108(1), 16B C.R.S. (1985 Supp.), which in turn affirmed the Board's decision. Because their challenge questions the constitutionality of the property tax statutes at issue, taxpayers appealed the district court's decision directly to this court. See § 13–4–102(1)(b), 6A C.R.S. (1987).

### B.

A brief overview of the manner in which real property is appraised is necessary for understanding the issues to be resolved.

The law governing the Assessor's valuation of most commercial real property provides, in part:

The actual value of such property ... shall be that value determined by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal. The assessor shall consider and document all elements of

[1] The board of county commissioners of each county (except Denver) sits as the board of equalization to hear property tax appeals. Colo. Const. art. X, § 15(1)(a); § 39–8–101, 16B C.R.S. (1982). The board of equalization for the City and County of Denver is determined by the city charter. § 39–8–101, 16B C.R.S. (1982).

[2] The Board granted some relief to the owners of five properties, who contended that the Assessor impermissibly utilized different data in appraising their property in 1985 than he used in 1984. The Board agreed and adjusted those properties' valuations accordingly. That portion of the Board's decision is not before us.

such approaches that are applicable prior to a determination of actual value.... § 39–1–103(5)(a), 16B C.R.S. (1985 Supp.).[3] The actual value, as found by the Assessor, is used to determine a "valuation for assessment," or assessed value, upon which property taxes are levied. § 39–1–104(1), 16B C.R.S. (1987 Supp.).

■ The statutes do not require, however, that the Assessor appraise all real property within his jurisdiction each year to determine the properties' actual values during the tax year for assessment purposes. Instead, the General Assembly has mandated a "base year" method of assigning values to property, under which the value of real property is based upon a specified year (the base year). The base year value is then utilized in calculating the property's assessed value each year until a new base year is fixed and the property is revalued.

The statute governing valuations for assessment applicable here provided that:

> For the years 1983 through 1986, the 1977 level of value and the manuals and associated data published for the year 1977 by the administrator and approved by the advisory committee to the administrator shall be utilized for determining actual value of real property....

§ 39–1–104(10)(a), 16B C.R.S. (1985 Supp.). The term "level of value" as used in that section means:

> [T]he actual value of taxable real property as ascertained by the application of the applicable factors enumerated in section 39–1–103(5) for the calendar year immediately preceding the "base year", which is the year for which the administrator is required by this article to publish manuals and associated data.

§ 39–1–104(9)(c), 16B C.R.S. (1982). Under those provisions, assessed values for the tax years 1983 through 1986 were determined with reference to the 1977 base year, and the 1977 level of value was in turn based on economic conditions as they existed in 1976. Those conditions encompassed such factors, among others, as construction costs, market value, vacancy rates, rental income, tax levels, operating expenses, and capitalization rates.

Robert M. Higgins, Supervisor of Appraisals in the Arapahoe County Assessor's Office, explained the Assessor's implementation of the base year method and his ultimate valuation of real properties:

> We did an analysis of values in Arapahoe County for 1977, 1/1/77. We looked at cost approach, market approach and income approach and weighed those values and tested those values within our county and arrived at a correlated value, which we had used on all the properties.

## II.

Taxpayers contend that the Assessor's values are invalid because they failed to reflect economic data current at the time of appraisal, or in the alternative, that if the statutes do not permit consideration of such data then the statutes violate article X, section 3(1)(a) of the Colorado Constitution. In addition, taxpayers argue that the Assessor's appraisals and methods violated several statutory guidelines and were not based on adequate data.

### A.

■ Taxpayers argue first that the Assessor's appraisals are invalid because the Assessor relied on 1976 normal vacancy rates and property tax rates, among other data, in valuing taxpayers' buildings. They contend that the appraisals should have reflected 1985 vacancy and property tax rates.

Because vacancy rates and property tax rates in the Denver Tech Center were substantially higher in 1985 than in 1976, the Assessor's appraisals yielded higher values for taxpayers' properties than would have resulted had the Assessor used economic data from 1985. The Assessor claims, however, that he was prohibited by statute from considering 1985 economic data in

---

**3.** The statutes provide further restrictions on the methods of appraising certain other properties, including residential real property and agricultural property. *See generally* § 39–1–103, 16B C.R.S. (1987 Supp.).

fixing the properties' base year value. We agree.

Section 39–1–104(10)(a), 16B C.R.S. (1985 Supp.), requires that Assessors utilize "the 1977 level of value and the manuals and associated data published for the year 1977 ... for determining actual value of real property...." Once a property's correct base year value is determined in accordance with that section, the property may not be revalued to a level higher or lower than the base year value,

> [E]xcept as necessary to reflect the increase or decrease in actual value attributable to an unusual condition. For the purposes of this paragraph (b), an unusual condition which could result in an increase or decrease in actual value is limited to the installation of an on-site improvement, the addition to or remodeling of a structure, a change of use of the land, the creation of a condominium ownership of real property ..., any new regulations restricting or increasing the use of the land, or a combination thereof, any detrimental acts of nature, and any damage due to accident, vandalism, fire, or explosion....

§ 39–1–104(11)(b)(I), 16B C.R.S. (1985 Supp.).

The base year method thus requires that property valuations be obtained by fixing those valuations to conditions that existed in the specified base year. Under the base year method, properties should be assigned equal actual values when their real economic values in 1977 were equal.[4] Although the legislature recognized that certain conditions may render a property's real economic value during a tax year greater than or less than its base year value, it chose to limit revaluation to those cases in which it deemed that a change in the property or in the property's use rendered application of the base year value unjust. Although a change in economic conditions might result in a property's tax year value rising above or below its base year value, the legislature decided not to permit consideration of such changes in adjusting a property's actual value for tax years to which the base year value applied except in limited circumstances.

The taxpayers' position—that appraisals should be based on 1985 economic data—is inconsistent with the base year method of valuation as embodied in section 39–1–104(10)(a), and their contention that abnormally high vacancy rates and increased property tax burdens constitute changed conditions ignores the plain language of section 39–1–104(11)(b)(I) expressly limiting the changed conditions that can justify a revaluation. We therefore reject taxpayers' contention that the statutes permitted consideration of 1985 economic data in determining a property's base year value.

■ Taxpayers argue further that to the extent the statutes do not permit 1985 economic year data to be considered, they violate the following provision of the Colorado Constitution:

> The actual value of all real and personal property ... shall be determined under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of all real and personal property not exempt from taxation under this arti-

---

4. Thus, when fixing a base year value to improvements completed subsequent to the base year, the assessor must determine what the value of the improvements would have been had they existed during the base year. For example, a building that is completed in 1984 must be valued, for 1985 tax purposes, as though it had existed in 1977, and the relevant vacancy rates, property tax rates, rental rates, capitalization rates, and other economic data are those utilized in appraising buildings in 1977, even if actual 1984 economic data are different.

As explained below, a building completed in 1977 may not be revalued in 1984 to reflect lower vacancy rates or higher property tax rates. Were the assessor required to appraise a building completed in 1984 on the basis of lower 1984 vacancy rates and higher tax rates, then the building completed in 1977 would be penalized solely because it was completed earlier. Similarly, when economic conditions in a particular area improve drastically between the base year and the tax years to which that base year applies, the appraisal of all buildings based on a specified base year serves to ensure that buildings completed after the base year are not penalized with higher appraised values than similar buildings completed before the base year solely by virtue of their completion dates.

cle. Valuations for assessment shall be based on appraisals by assessing officers to determine the actual value of property in accordance with provisions of law, which laws shall provide that actual value be determined by appropriate consideration of cost approach, market approach, and income approach to appraisal ·[except for agricultural and personal real property].…

Colo. Const. art. X, § 3(1)(a).

Taxpayers' argument is based on the observation that the valuation gap (the period between the base year and the tax years in which that base year value is utilized to calculate assessed value) may be accompanied by changes in the economic conditions which supported the base year valuations. One result of utilizing a base year method, taxpayers contend, is that a property's tax year value may be greater than or less than its base year value. In turn, two buildings may have the same tax value in 1985 (in light of their similar base year values) and thus have identical tax burdens even though in 1985 one building was completely vacant and the other building was completely occupied. In light of that fact, taxpayers argue, the base year system of valuation does not "secure just and equalized valuations for assessments" as required by the state constitution.

Although we agree that such a result is possible when the base year method is utilized, that result does not, in and by itself, render the base year scheme unconstitutional.

It is axiomatic that legislation is presumed constitutional and those who attack its validity must prove beyond a reasonable doubt that the legislation is unconstitutional. *People v. Revello*, 735 P.2d 487, 489 (Colo.1987); *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 214 (Colo.1984); *Curnow v. Yarbrough*, 676 P.2d 1177, 1185 (Colo. 1984). Our duty in construing the constitution is to give effect to the electorate's intent in enacting the provision at issue. *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, 189 Colo. 1, 7, 536 P.2d 308, 313 (1975); *White v. Anderson*, 155 Colo. 291, 298, 394 P.2d

333, 336 (1964); *Board of Education v. Spurlin*, 141 Colo. 508, 516–17, 349 P.2d 357, 362–63 (1960). When that intent is expressed in plain, clear language, we may not resort to a strained interpretation but instead must apply the constitutional provision according to its clear terms. *Colorado Ass'n of Public Employees v. Lamm*, 677 P.2d 1350, 1353 (Colo.1984); *A–B Cattle Co. v. United States*, 196 Colo. 539, 545, 589 P.2d 57, 61 (1978); *Colorado State Civil Service Employees Ass'n v. Love*, 167 Colo. 436, 444–45, 448 P.2d 624, 630–31 (1968).

In applying a constitutional provision whose language does not clearly dictate a particular result, to better inform our judgment we will look to the state of the law as it existed when the provision was adopted, and we are assisted by the presumption that the provision was framed and adopted "in the light and understanding of prior and existing laws and with reference to them." *Krutka v. Spinuzzi*, 153 Colo. 115, 124, 384 P.2d 928, 933 (1963) (citation omitted). Similarly, "the evident contemporary interpretation of those actively promoting the amendment, should be accorded considerable weight." *Bedford v. Sinclair*, 112 Colo. 176, 182, 147 P.2d 486, 489 (1944).

Although article X, section 3(1)(a) requires that the legislature employ such valuation methods as will "secure just and equalized valuations. for assessments of all real and personal property," the only further limitation on the legislature's choice of a valuation scheme is the provision's requirement that assessors consider particular appraisal methods in determining actual values.

There is substantial evidence, however, that article X, section 3 was not intended to proscribe utilization of the base year method of valuation as employed in this case. At the time article X, section 3 was amended in 1982, the base year method of valuation had been in place for several years. Section 39–1–104(9)(a), 16B C.R.S. (1982), for example, required that the 1973 level of value be used to determine the actual value of property for the purpose of calculating assessed value for the tax years 1977

through 1982. In addition, the restrictions on the types of changed conditions that could justify a revaluation were applicable to those tax years, § 39–1–104(11)(b), 16B C.R.S. (1985 Supp.), and the provision mandating use of the 1977 level of value during tax years 1983 through 1986 was enacted nearly five years before the 1982 constitutional amendment was passed. *See* Ch. 494, sec. 4, § 39–1–104, 1977 Colo.Sess. Laws 1728, 1731–32.

■ Finally, the legislative council's summary of the amendment, which was published statewide for the benefit of voters prior to the general election in which the amendment was passed, interpreted the amendment as leaving the base year method untouched. *See* Legislative Council of the Colorado General Assembly, *An Analysis of 1982 Ballot Proposals* 1–9 (Research Publication No. 269, 1982); § 2–3–303, 1B C.R.S. (1980). The legislative council's interpretation, while not binding, provides important insight into the electorate's understanding of the amendment when it was passed. *See also* Israel & Schnase, *Property Tax Assessments in Colorado*, 12 Colo.Law. 563, 564 (1982) (the amendment "left intact many of the preexisting statutory standards controlling how actual market value is to be determined ... [including] the 'base year' rules which specify the year that will be used for determining the actual values of taxpayers' properties."); Low, *Appealing Property Tax Assessments*, 14 Colo.Law. 798 (1985) (discussing base year method and tax appeal procedures).

The General Assembly was certainly aware of the application of the base year method when it drafted the amendment to article X, section 3 as eventually submitted to the people for ratification, yet it chose not to eliminate use of the base year method. Had the amendment been intended to cure any perceived injustice that might arise from the base year system—such as those problems that arise from the lag between base years and the tax years during which they are utilized—the drafters could have chosen language more explicitly limiting use of the base year method.

But not only is the "just and equalized" clause silent as to the operation of the base year method, the very amendment upon which the taxpayers rely recognizes, by its reference to "level of value," use of the base year method. In a provision designed to ensure that the ratio of residential property taxes to total property taxes did not increase, we find the following language:

> For each year in which there is a change in the level of value used in determining actual value, the general assembly shall adjust the ratio of valuation for assessment for residential property ... as is necessary to insure that the percentage of the aggregate statewide valuation for assessment which is attributable to residential property shall remain the same as it was in the year immediately preceding the year in which such change occurs. Such adjusted ratio shall be the ratio of valuation for assessment for residential property for those years for which such new level of value was used.

Colo. Const. art. X, § 3(1)(b).

In light of the existing use of the base year method when article X, section 3 was enacted, and because the amended constitutional provision referred to and presumed utilization of the base year method, we are not convinced that the "just and equalized" clause can be construed as limiting the use of the base year method as it applied to the taxpayers' property.

The primary difficulty with the base year method, as identified by the taxpayers, is that changes in economic conditions are not reflected in tax burdens until the base year is changed, and even then the application of base year data to determine property values in subsequent tax years may not yield values that precisely reflect the actual economic values of properties.

But even if the closeness of the relation between a property's appraised value and its real economic value were the sole factor in determining whether the base year method secured "just and equalized valuations," we would not be persuaded that the taxpayers have proved that the base year method as applied to their properties is unconstitutional. We cannot find in the

record of this case evidence sufficient to show beyond a reasonable doubt that the six-year to nine-year delay between the 1977 level of value and the 1983 through 1986 tax years is so extreme as to amount to a constitutional defect. Our conclusion is supported by the fact that almost identical delays (the 1973 base year applied to 1977 through 1982 tax years) attended the base year method as it existed at the time article X, section 3 was amended, and our understanding—as outlined above—that the amendment was not intended directly to impair future utilization of the base year method.

More important, however, taxpayers' argument presupposes that the sole goal of a just and equalized tax system is to match appraised values with real economic values as closely as possible. Taxpayers, however, have ignored the attributes of the base year method that may commend that method as more just than a method that utilizes only tax-year economic data and requires constant reappraisal of property. Financial planning considerations, for example, favor as more just that system that allows taxpayers to predict their future tax burdens most accurately and to plan for them accordingly. In that respect, the base year method is superior to a current year appraisal method. Similarly, the base year method substantially dampens the property tax effects of a volatile economic climate. The legislature might reasonably conclude that a current year appraisal method is grossly unjust to the extent it compels a property owner whose property appreciates rapidly and unexpectedly to shoulder a tax burden he could not reasonably have foreseen and for which he was unable to prepare adequately.

By deciding to maintain the base year method, the legislature has decided that predictability of property taxes and the minimization of drastic fluctuations are important considerations in devising a "just and equalized" system of property valuation. Were we to accept taxpayers' argument that actual tax-year economic conditions must be considered in valuing properties, we would merely be substituting our judgment for the legislature's as to the

proper balance of the numerous factors outlined above. The constitution delegates to the legislature, and not to us, the difficult task of implementing a valuation system that satisfies the ideals of a "just and equalized" system of valuations for assessments.

Although taxpayers are certainly correct in pointing out that the valuation system at issue is not perfect, the mere recitation of the defects is insufficient to prove beyond a reasonable doubt that the base year method, as applied here, is unconstitutional.

We conclude, therefore, that the Assessor did not err in refusing to consider 1985 economic conditions in valuing taxpayers' property.

### B.

■ Taxpayers interpose numerous other objections to the Assessor's valuations. First, they contend that because the Board refused to allow the Assessor to utilize rent rates for 1985 valuations that were greater than those the Assessor utilized for 1984 assessments with respect to five buildings, the data the Assessor utilized for the remaining properties at issue must have been incorrect. The taxpayers did not show, however, that when the Assessor appraised the remaining properties he utilized different data for different tax years or that the data the Assessor used inaccurately represented 1976 economic data. We therefore reject taxpayers' contention.

Taxpayers further contend that the Assessor's valuations were invalid because he relied solely on the cost approach in determining properties' values in contravention of the constitutional mandate that assessors consider the market and income approaches as well. Higgins specifically refuted that contention when he testified that the Assessor utilized a correlated cost approach that itself reflected consideration of the market and income approaches. The Board chose to credit Higgins' testimony, and the record does not reflect that Higgins' explanation was inaccurate.

Taxpayers argue next that the Assessor's office provided inconsistent testimony

as to the basis of the values that the Assessor used in performing cost approach appraisals. The only statements purportedly contradicting Higgins' testimony were those embodied in a file memorandum in which a named but otherwise unidentified writer summarized a 1984 conversation she had with Bernie Neff of the Assessor's office. Taxpayers' counsel called Neff as a witness at the Board hearing, but did not attempt to elicit any testimony verifying the substance of the file memorandum or otherwise contradicting Higgins' explanation of the data utilized in performing appraisals under the cost approach. In light of the limited evidence suggesting some disagreement among the Assessor's employees' understanding of the manner in which the cost approach data were derived, the Board did not err in accepting Higgins' testimony.

■ Taxpayers contend also that the Assessor erred in failing to consider an appraisal of Denver Tech Center properties that Peter Bowes, a professional appraiser, completed in 1977 for a commercial bank and in failing to consider various other sources of information that taxpayers thought appropriate. Nothing in the applicable statutes requires that the Assessor consider every piece of information submitted to him, and Higgins specifically testified that he rejected some of the sources upon which taxpayers relied because he was not convinced of their reliability. The Assessor acted well within his authority in declining to consider the information proffered by taxpayers.

■ Taxpayers contend that the Board's decision is invalid because it failed to issue with its order specific findings of fact and conclusions of law. The hearing and appellate procedures applicable to property tax protests do not require that the board of equalization issue formal findings of fact or conclusions of law, but only that the board "shall grant or deny the petition [for review], in whole or in part, and shall notify the petitioner and the assessor in writing." § 39-8-107(1), 16B C.R.S. (1982). Although the general state administrative procedure law does require that agencies

issue such findings and conclusions, § 24-4-105(14), 10 C.R.S. (1982), that provision does not apply to board decisions in light of the specific hearing and appellate provisions set out in the property tax statutes. The Board's failure to issue findings of fact and conclusions of law was thus not erroneous.

■ Finally, taxpayers argue that the valuations for assessment were not supported by adequate evidence. An assessor's appraisal is presumed correct, and "one who attacks it has the burden of affirmatively and clearly showing that it is manifestly excessive, fraudulent, or oppressive." *Stalder v. Board of County Commissioners*, 147 Colo. 493, 497, 364 P.2d 389, 391–92 (1961) (quoting *Citizens' Committee v. Warner*, 127 Colo. 121, 131, 254 P.2d 1005, 1010 (1953)). Although Bowes' appraisals yielded substantially lower values, the Board implicitly viewed the Assessor's evidence as more persuasive and the Assessor's values as justified. It is solely within the Board's province to weigh the testimony and evidence presented to it, and the record in this case includes substantial evidence supporting the Board's decisions. Taxpayers have not demonstrated, therefore, that the Assessor's appraisals were manifestly excessive, fraudulent, or oppressive.

Accordingly, the judgment of the district court upholding the Board's order is affirmed.

ERICKSON, J., dissents.

ERICKSON, Justice, dissenting:

I respectfully dissent from the majority's holding that the applicable property tax statutes are constitutional. The current statutory scheme for property taxation permits the assessor to ignore current adverse economic conditions, thereby permitting unjust and unequal taxation.

As noted by the majority, article X, section 3(1)(a) of the Colorado Constitution, provides that property tax levies shall be uniform, just and equal, and shall be based upon the actual value of the property.

The statutory property taxation scheme, codified at sections 39–1–101 to 39–1–119, 16B C.R.S. (1982 & 1985 Supp.), allows the assessor to assess property taxes in 1985 based upon 1977 property values. *See* § 39–1–104 (10)(a), 16B C.R.S. (1985 Supp.). The 1977 actual values, in turn, are based upon 1976 economic conditions, including 1976 office building vacancy rates. § 39–1–104(9)(c), 16B C.R.S. (1982). Therefore, it is well within the assessor's discretion under the present statutory scheme to assess property taxes in 1985 based solely on 1976 economic conditions. As acknowledged by the majority, when this base year method is used, two buildings may have identical tax burdens, even though in 1985 one building is vacant and the other is fully leased.

In my view, a taxation scheme that permits such circumstances to exist, ignoring the severe increase in office building vacancy rates between 1976 and 1985, violates article X, section 3(1)(a) of the Colorado Constitution, and the equal protection clauses of the United States and Colorado Constitutions.[1]

In order to find that a property tax statute is unconstitutional on equal protection grounds, it must be clear that no rational relationship exists between the goals and effects of the statute. *Colorado Dept. of Social Servs. v. Bd. of County Comm'rs*, 697 P.2d 1 (Colo.1985). Equal protection is guaranteed only if there is a rational basis for the tax classification scheme imposed. *Friends of Chamber Music v. City & County of Denver*, 696 P.2d 309 (Colo. 1985) (citing *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)).

The "goal" of the property tax statutes is established by the equal protection clauses and article X, section 3(1)(a); namely, to provide for uniform taxation laws and to secure "just and equalized" valuations for tax assessments. Here, because current economic conditions can be ignored,[2] and property values established on economic conditions that existed ten years ago, the goals of the statutory scheme have no rational relationship to the resulting effects. Moreover, assuming that the goal of the scheme is also to secure equalized and uniform taxation, there is no rational basis for a classification scheme that assesses identically a fully leased office building with one that is entirely or partially vacant.

Accordingly, I dissent.

---

1. I recognize that a property's base year valuation may be readjusted to a higher or lower level if a decrease in actual value is attributed to an "unusual condition." § 39–1–104(11)(b)(I), 16B C.R.S. (1985 Supp.). Further, the assessor may, if he so chooses, consider vacancy rates as a factor under the "income approach" to valuation. *See* § 39–1–103(5)(a), 16B C.R.S. (1985 Supp.). This does not alter my conclusion that the scheme is unconstitutional, however, because section 39–1–104(11)(b)(I) does not list economic obsolescence as an "unusual condition," and limits a finding of "unusual condi-

tion" to very specific occurrences, such as change in the use of the land, vandalism, or fire. Moreover, under the statutory scheme, the assessor is not required to use the income approach when valuing property.

2. Prior to the enactment of the current statutory scheme, we held that economic obsolescence should have an important bearing on the determination of property value for tax purposes. *See Colorado & Utah Coal Co. v. Rorex*, 149 Colo. 502, 369 P.2d 796 (1962).