No. 21252.

GEORGE J. WHITE v. BYRON A. ANDERSON, SECRETARY OF STATE, ET AL.

(394 P.2d 333)

Decided July 17, 1964.

292

Mr. RAYMOND C. JOHNSON, Mr. MARSHALL QUIAT, for petitioner.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. RICHARD W. BANGERT, Assistant, for respondents.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

IN original proceedings White challenges the validity of Senate Bill No. 1, passed by the General Assembly and signed by the Governor in July of this year, as being in contravention of Article V, Section 47, of the constitution of Colorado.

What effect does the entry of a decree and the retention of jurisdiction by the federal three-judge court of the case of *Lucas v. 44th General Assembly, et al.,* (Case Nos. 7501 and 7637, consolidated civil actions), announced this month, involving apportionment and districting of members of our General Assembly, have on the authority of this court to consider and determine whether Senate Bill No. 1 comports with the constitution of Colorado? If the entry of the decree and if the retention of jurisdiction have no effect, then we must determine whether the division of a county in the formation of senatorial and representative districts is in accord with the constitution of this state.

As we understand the respective jurisdictions of federal and state courts, and the amenities between courts having different jurisdictions derived from separate but related sovereign governments which are supreme in their spheres, there will be a hyphenated disposition of the *whole* controversy — federal and state questions — if we act. The federal court has decided the federal question which confronted it, and it becomes our concern and duty to resolve the state question.

We defer to the federal courts in the resolution of federal questions. On the other hand, federal courts should, indeed must, defer to the authority of state courts in the disposition of state questions. *Harrison v. N.A.A.C.P.*, 360 U. S. 167, 79 S. Ct. 1025, 3 L. Ed. (2d) 1152. This concept so pervades the relation between federal and state courts that it was said in the cited case that "federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them * * *."

It is in this setting that we briefly review recent events involving apportionment of the General Assembly of this state.

In June of this year the Supreme Court of the United States decided the case of *Lucas v. 44th General Assembly*, 377 U. S. 713, 84 S. Ct. 1459, 12 L. Ed. (2d) 632, and concluded its opinion with these significant words:

"Since the apportionment of seats in the Colorado Legislature, under the provisions of Amendment No. 7, fails to comport with the requirements of the Equal Protection Clause, the decision below must be reversed. Beyond what we said in our opinion in Reynolds, we express no view on questions relating to remedies at the present time. On remand, the District Court must now determine whether the imminence of the 1964 primary and general elections requires that utilization of the apportionment scheme contained in the constitutional amendment be permitted, for purposes of those elections, or whether the circumstances in Colorado are such that appellants' right to cast adequately weighted votes for members of the State Legislature can practicably be effectuated in 1964. Accordingly, we reverse the decision of the court below and remand the case for further proceedings consistent with the views stated here and in our opinion in Reynolds v. Sims. It is so ordered."

A course of action looking to the preservation of elections was pursued by state officials. Rather than petition for a rehearing in Lucas with its time-consuming pace to resolution, the Governor convoked a special session of the legislature for the purpose of apportioning the state in accordance with Article V, Sections 45-47, of the State constitution. Such special session received the approval of the three-judge federal court to which had been remanded the Lucas case.

Senate Bill No. 1 thereafter was enacted and submitted to the three-judge federal court before the Governor's signature was affixed thereto. At the time of such submission there was pending before this court proceedings testing the validity of Senate Bill No. 1 on the ground that it violated the state constitution, particularly in dividing a county into multiple senatorial and representative districts.

Notwithstanding this posture of circumstances, the three-judge federal court determined that Senate Bill No. 1 was inoffensive to the Equal Protection Clause, and in a dictum expressed by two judges, to which the third voiced his dissent, declared that division of counties into multiple senatorial and representative districts was valid.

■ Now it is urged by respondents that this court is foreclosed from resolving the constitutionality of Senate Bill No. 1, even though the question is purely one of interpretation of the constitution of Colorado. To this we do not accede. It is and was within our domain to determine the state question, and such has been recognized by the federal decisions, as appears from a profusion of cases cited in 36 C.J.S. § 171, p. 393 et seq.

■ Having determined that the action of the three-judge federal court in the premises has no effect upon the case pending before us, we now undertake to answer the question of validity of Senate Bill No. 1. This will entail a consideration in particular of Article V, Section

47. Related provisions necessarily to be considered merely strengthen our construction of Section 47.

Section 47 contains three sentences, to-wit:

"Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district."

█ It must be remembered that the constitution itself created the first senatorial and representative districts. The first sentence of Section 47 gave to the legislature the power to alter those districts when public convenience might require, but that power was subject to the interdictions that (1) in altering or forming districts the legislature must not join two counties which were not contiguous, and (2) they must not divide a county. The language is clear and plain. A grant of power is given in the first sentence of Section 47 and limitations are placed upon that power by the last two sentences.

It will be noted that the first sentence provides for the alteration of such districts as public convenience may require. The second sentence provides for senatorial or representative districts *composed* of two or more *counties* which must be contiguous, and speaks in terms of whole counties. There is contained in the sentence the notion that a senatorial or representative district cannot be less than a county; in effect it means that if you add to a county other territory to make such district, the added territory must be a county or counties.

█ The most all-inclusive proposition in the three sentences is contained in the third. It provides that "no county shall be divided in the formation of a senatorial or representative district." "No county" cannot be construed as meaning that one county, or two counties, or three counties may be divided; it plainly directs that there is not one county in the state of Colorado that

may be divided in the formation of a senatorial or representative district.

The Attorney General would have us construe the section to read, in effect, as follows: "No county shall be divided in the formation of a senatorial or representative district composed of two or more counties, but may be divided for other purposes." This argument might have some weight if the second and third sentences of Section 47 were joined by a semi-colon and the word "but" inserted. We would then have a sentence reading as follows: "When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be; but no county shall be divided in the formation of a senatorial or representative district" or "in the formation of *such* senatorial or representative district."

■ If the citizens desire to amend the constitution so as to permit such division, it is within their power to do so, but until they so act, neither legislature nor court can do it for them.

■ There is a presumption that the language and structure of a provision in a constitution were adopted by choice, and that discrimination was exercised in the language and structure used. *People ex rel. v. May,* 9 Colo. 80, 10 Pac. 641. Choice and discrimination in these respects give no solace to the Attorney General.

■ This court is obliged to ascertain and give effect to the intent of the Constitutional Convention and of the people who ratified that which the Convention framed. This is our primary guideline in construing the constitution. *Cooper Motors v. Board of County Commissioners,* 131 Colo. 78, 279 P.2d 685. In ascertaining the intent of the Convention and of the people in adopting our constitution, the whole of Article V as originally adopted is the best criterion. *People v. Field,* 66 Colo. 367, 181 Pac. 526.

■ From statehood to the present day, Article V, Section 47, has remained unchanged. During that time,

the third sentence of Section 47 has not been judicially construed, but a general tacit construction and a written opinion by the Attorney General of this state have viewed the division of a county in the formation of legislative districts as violative of its prohibition. This traditional view has some significance in cases involving consideration of constitutional provisions where there is room for interpretation, *People v. Hinderlider*, 98 Colo. 505, 57 P.2d 894.

Perhaps this traditional interpretation had a beginning in Article V, Sections 48 and 49, of the original constitution, and because Sections 48 and 49 served their purpose and expired upon their execution, thereby becoming unnecessary as part of the constitution, they were forgotten as sources of this interpretation.

Section 48 directed that:

"Until the state shall be divided into senatorial districts, in accordance with the provisions of this article, said districts shall be constituted and numbered as follows: * * *"

Thereafter appears a designation of twenty senatorial districts, the third of which is illustrative. It reads as follows: "The county of Boulder shall constitute the third district, and be entitled to two senators."

Other senatorial districts thus created also provided for multiple senators.

Section 49 provided that:

"Until an apportionment of representatives be made, in accordance with the provisions of this article, they shall be divided among the several counties of the state in the following manner: * * *"

Thereafter multiple representatives were designated for most of the counties; some were designated as entitled to one, and two counties jointly were given one.

It should be noted that the people did not divide any county where represented by multiple senators or representatives. To us this is consistent with the prohibition expressed by the third sentence of Section 47.

These two sections were self-executing. *Fairall v. Frisbee,* 104 Colo. 553, 92 P.2d 748. When they served their purpose, they expired. But their presence in the original draft makes clear the intent of the people in ratifying the constitution.

At the time our Colorado constitution was in the process of being drafted, some twenty constitutions of other states had a variety of provisions relating to the formation of legislative districts. Some of these states had provisions similar to that adopted by this state. Others provided for the division of counties in the formation of such districts.

It is common knowledge that constitutions of other states were considered by the Convention in the framing of our constitution. At least one of those constitutions expressly provided that a portion of one county could not be added to another to form a district, while other constitutions being considered had the same complete interdictions against division of counties which appears in our constitution. If the framers of our constitution intended only to prohibit the division of a county for the purpose of joinder to another county, they had before them the exact language necessary to accomplish that purpose. That our constitutional convention did not adopt that language but chose instead words which clearly provided that a county shall *not* be divided in the formation of a district has significance; it is persuasive of the fact that it did not want single counties divided to form multiple districts.

Moreover, in states whose constitutions contain a phrase providing that no county shall be divided in the formation of a district, amendments to those constitutions have been enacted permitting division of counties before any legislative division of such counties into so-called sub-districts have been made. See, e.g., the constitutions of California, Connecticut, Michigan, Missouri, North Carolina, and Oregon.

Our consideration of the validity of Senate Bill No. 1

leads us to the conclusion that the division of counties to form senatorial or representative districts finds no sanction in our constitution.

 We must now determine whether the portions of the Act dealing with the division of single counties into multiple legislative districts are severable from the remainder of the Act. As illustrative of the difficulties confronting the court in any attempt to hold the invalid portions of the Act to be severable from valid portions, we refer to Section 1 and Section 2 (1) of the Act.

Section 1 of the Act provides that there shall be one senator for each senatorial district. Section 2 (1) of the Act provides that "There shall be nine senatorial districts within the City and County of Denver," (not nine senators from Denver), and then proceeds to set up those senatorial districts. If we strike Section 2 (1) from the Act as invalid, we are left with no senatorial districts in Denver nor with any provision for senators from Denver. The same situation applies to other counties which have been divided into multiple districts.

 Without representation from Denver and from other multiple district counties, the Act obviously cannot stand. In determining a section to be severable we may certainly strike a section of that Act as invalid, but we cannot enact another section to take its place, for that is solely a legislative function. And if the purposes of the Act cannot be carried out without the section which is stricken, as it cannot be here, then the Act is not severable and the entire enactment must fail. *Denver v. Lynch,* 92 Colo. 102, 18 P.2d 907, 86 A.L.R. 907.

An election is imminent. Some of the election laws were amended at the same time Senate Bill No. 1 was enacted. See House Bill 1001, effective July 8, 1964. These election laws stand unchallenged. They changed the dates for the senatorial and representative assemblies and provided for new deadlines for the certification of candidates for the primary election, and pro-

vided for the manner in which precincts must be created by the designated officials. These dates are upon us, and thus this court is confronted with a situation not of its making.

Had this court "been afforded a reasonable opportunity to pass upon" the state constitutionality of Senate Bill No. 1 before the federal three-judge court acted, the impending election would not be in the plight it is today.

The difficulty created by the three-judge federal court was twice-compounded in that not only did that court fail to await a decision of this court on the question of state constitutionality, but it failed to intimate that it might be advisable for the legislature then in session to seek by interrogatories an answer to the question of the Act's validity. And the plight of the impending election would not be what it is had the legislature on its own motion presented interrogatories to this court.

■■■ We must bring order out of a chaotic condition. What we have thus far said are considerations which require the exercise of judicial restraint in the disposition of this cause.

Confronted as we are with a situation in which an election is imperative and in which the rights of the voter should be preserved, it is incumbent upon this court to permit the election to be held. Like the chancellor, if we can find no precedent we must establish one. The court should be resourceful in fashioning a remedy commensurate with a complex situation.

In *Lucas v. 44th General Assembly,* 377 U. S. 713, 84 S. Ct. 1459, 12 L. Ed. (2d) 632, the Supreme Court of the United States indicated that if the situation were thus at the time of its remand to the Colorado United States District Court the election might even be held under Amendment No. 7 despite offending the 14th Amendment to the Constitution. Here, at least, we can have an election which does not violate the rights of the citizen voter, which the Supreme Court has said are

protected under the 14th Amendment to the United States Constitution.

Accordingly, the writ is made absolute, but we stay the effect of the judgment until after the convening of the regular session of the 45th General Assembly in 1965. Until further order of the court, jurisdiction of this case is retained. It is specifically noted that the remedy here fashioned has been recommended and approved by the United States Supreme Court in the recent case of *Reynolds v. Sims,* 377 U. S. 533, 84 S. Ct. 1362, 12 L. Ed. (2d) 506, as well as in *Lucas v. 44th General Assembly,* supra.

MR. JUSTICE MOORE dissents and MR. JUSTICE HALL specially concurs in part and dissents in part.

MR. JUSTICE HALL specially concurring in part and dissenting in part:

Properly presented to this court for consideration and resolution is one question: ARE CERTAIN PROVISIONS OF SENATE BILL NO. 1 VIOLATIVE OF THE PROVISIONS OF SECTION 47, ARTICLE V, OF THE CONSTITUTION OF THE STATE OF COLORADO?

Senate Bill No. 1, herein referred to as No. 1, the validity of which is questioned, provides that there shall be more than one senatorial district in several named counties.

Section 47, Article V, provides:

"Senatorial and representative districts — [1] Senatorial and representative districts may be altered from time to time, as public convenience may require. [2] When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. [3] No county shall be divided in the formation of a senatorial or representative district." (Numbering mine.)

As I view Section 47, the people, in 1876, undertook by the first sentence [1] to grant to the legislature

*authority* to alter senatorial districts from time to time. Coupled with and made an integral part of the grant, they imposed a qualification limiting the authority granted to situations "as public convenience may require." This sentence [1] is complete, the words used are words in common usage and readily understandable. The language is so plain that there can be no doubt as to what the people said and meant.

The second sentence [2], unlike the first, does not purport to grant power, but rather to further qualify and limit the power granted in [1]. The sentence places two further limitations on the grant of power by [1]. First, in saying that counties "shall be contiguous," it necessarily follows that they may not be noncontiguous. There is nothing fuzzy, doubtful, or nebulous about this limitation on the power granted.

The second limitation, to the effect that the district be "as compact as may be," is a rather nebulous limitation, and legislators might well be in disagreement as to whether a multiple county district was as "compact as may be."

The third sentence [3] serves as a very definite further limitation of the rather broad and general power granted by [1], — "No county shall be divided * * *." The language is clear, the words used meaningful.

No doubt the people in 1876 had under consideration the question as to whether the legislature should be authorized to divide a county. One of three answers could have been made: (a) they may; (b) they must; (c) they must not. Their answer was: "No county shall be divided * * *." Did the people with those words say a county may be divided, a county must be divided? The answer is obvious.

Clearly, those sections of No. 1 dividing counties into districts are in flagrant violation of Article V of the Constitution — they are void and should be struck down and exterminated, now, once and for all, and without any spark of life left therein.

No. 1 contains several unconstitutional sections. If those sections are severed and nullified the remainder of No. 1 becomes meaningless, unconstitutional, and void. Severability is not possible. No. 1 must fall in toto.

I am in complete disagreement with the end result as pronounced by the majority.

I do not subscribe to the language of the majority that "it is incumbent on this court to fashion a remedy." As a member of the court I feel no incumbency to fashion a remedy — the extent of my feeling of incumbency is to properly resolve the problem presented, namely, is No. 1 constitutional? Were it incumbent upon me to fashion a remedy, I would certainly use my best efforts to see to it that the remedy fashioned be legal and constitutional.

Final disposition of the case is made by the majority in these words: "Accordingly, the writ is made absolute, but we stay the effect of the judgment until the convening of the regular session of the 45th General Assembly in 1965."

In my opinion this language is contradictory. By stating: "* * * the writ is made absolute," the majority has admonished Anderson — "Do not proceed in conformity with No. 1." Why? Because No. 1 is unconstitutional and void. Following that admonition the majority tells Anderson: "* * * but we stay the effect of the judgment [nullifying No. 1] until after the convening of the regular session of the 45th General Assembly in 1965."

I find nothing to "stay." The judgment *has no effect* — it is a mere pronouncement of the impotency of No. 1. The judgment, unlike a judgment for money, specific performance, possession, etc., which one may use as a means for attaining an ultimate goal, does not lend itself to further proceedings; it cannot be used as a means to an end; it is simply declaratory of that which is and has been.

Needless to say, I do not subscribe to procedures

whereby the judiciary tells a *public official*, one under oath to support the Constitution, having statutory and constitutional duties to perform, to knowingly conduct the affairs of his office in an unlawful and unconstitutional manner for a limited time, or at all.

I can readily understand that members of the court are deeply concerned. I too am deeply concerned. I am sure the people of the State of Colorado are deeply concerned. Possibly the governor and the legislators are deeply concerned — they should be. They and they alone are duty bound to make provision for lawful apportionment. Upon them rests the duty to "fashion a remedy" by constitutional legislative action. Such could be achieved with a minimum of effort, small expense and within a very, very few days. Those upon whom the responsibility rests can do it. They should do it. The judiciary cannot do it.

In my opinion the rule should be made absolute.

MR. JUSTICE MOORE authorizes me to state that he concurs in all that I have said with reference to the pronouncement of the majority, that "we stay the effect of the judgment."

MR. JUSTICE MOORE dissenting.

This is an original proceeding in this court in which petitioner sought to obtain relief with reference to the election of state senators and representatives pursuant to a purported amendment to the apportionment provisions of the Constitution of Colorado (Article V, Sections 44-47), and the legislation adopted by the General Assembly following the election of 1962 at which said purported constitutional amendment was approved by the people. On the original petition we issued our rule to show cause. On the day prior to that on which the matter was set for oral argument, the Supreme Court of the United States decided the case of *Andres Lucas et al., etc., v. The Forty-fourth General Assembly of the*

*State of Colorado, et al.,* announced June 15, 1964, the effect of which was to invalidate the above referred to constitutional amendment and much of the legislative act which had been adopted in implementing same. The questions originally presented by petitioner were made moot by the decision of the Supreme Court of the United States.

We granted leave to petitioner to file an amended petition in which the apportionment statute adopted by the legislature, called in special session for the purpose of meeting the requirement of the federal courts, was attacked as being in violation of Article V, Section 47 of the Colorado Constitution. A rule to show cause issued as prayed in the amended petition; the respondents made answer; and oral arguments have been had.

I address myself to the single question we are called upon to determine, which is stated as follows: *May a county be divided to form two or more senatorial or representative districts, each of them to be totally within such county?*

The pertinent section of the Colorado Constitution is Article V, Section 47, which reads as follows:

"Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district."

The act of the General Assembly adopted July 8, 1964, and signed by the Governor the same day, contains the following provision:

"SENATORIAL DISTRICTS — NUMBER — COMPOSITION — (1) Districts 1-9 — city and county of Denver. There shall be nine senatorial districts within the city and county of Denver which shall be numbered as follows and shall consist of the following whole general election precincts: * * *"

The election precincts forming a part of each of the nine senatorial districts are then identified. Similar provisions are contained within the Act creating senatorial districts in El Paso, Jefferson, Pueblo, Adams, and Arapahoe counties. The Act also creates eighteen "representative districts" within the City and County of Denver, and multiple "representative districts" in other counties within the territorial limits of each such county.

The question before us is one which involves an interpretation of the state constitution, and in this field our court is the final arbiter. Under well established law the federal courts are obligated to accept the interpretation given to state constitutions by the highest court of the state. As stated by the Supreme Court of the United States in *Harrison v. N.A.A.C.P.*, 360 U. S. 167:

"This now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize the possibility of such interference a 'scrupulous regard for the rightful independence of state governments . . . should at all times actuate the federal courts,' *Matthews v. Rodgers*, 284 U. S. 521, 525, as their 'contribution . . . in furthering the harmonious relation between state and federal authority . . .' *Railroad Comm'n v. Pullman Co.*, 312 U. S. 496, 501. In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. * * *"

We have issued the rule to show cause in this case and have had arguments pertinent to the question involved in order that the three judge special Federal

Court sitting pursuant to the mandate of the Supreme Court of the United States in *Lucas v. Colorado General Assembly,* supra, may have the benefit of our interpretation of the Colorado Constitution in so far as pertinent to the matter pending before that court.

As was stated by this court in *Johnson v. McDonald,* 97 Colo. 324, 49 P.2d 1017:

"Our determination of this cause will be less difficult, if at the threshold of our consideration, we bear in mind the foregoing conception of the nature of our state Constitution, and if we further bear in mind that the function of courts in passing upon the constitutionality of legislative acts is to determine whether the Constitution inhibits or limits the power sought to be exercised thereby, rather than to determine the wisdom or policy of the acts. Courts are concerned with questions of the power of the legislature to act, but not with the policy it pursues within its powers. The determination of legislative policy within its powers is the prerogative of the legislature solely. This principle of law is well expressed in *Commonwealth ex rel. v. Reeder,* 171 Pa. 505, 513, 33 Atl. 67, 33 L.R.A. 141, quoted with approval in *Tranter v. Allegheny County Authority,* 316 Pa. 65 (173 Atl. 289), at page 75: 'Whatever the people have not, by their constitution, restrained themselves from doing, they, through their representatives in the legislature, may do. This latter body represents their will just as completely as a constitutional convention, in all matters left open by the written constitution. Certain grants of power, very specifically set forth, were made by the state to the United States, and these cannot be revoked or disregarded by state legislation; then come the specific restraints imposed by our own constitution upon our own legislature; these must be respected; but in that wide domain not included in either of these boundaries the right of the people through the legislature to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is

not the business of the courts to inquire. We peruse the expressions of their will in the statute; then examine the constitution and ascertain if this instrument says "Thou shalt not," and if we find no inhibition, then the statute is the law, simply because it is the will of the people and not because it is wise or unwise.' "

To like effect is the opinion in *District Landowners Trust, et al., v. County of Adams, et al.,* 104 Colo., 146, 89 P.2d 251.

In reaching a conclusion on the question as to whether the act of the legislature violates the above quoted section of the constitution, I have given due consideration to the following pronouncements of this court:

*First.* "A statute should be construed in a manner to harmonize it with existing constitutional provisions if it is reasonably possible to do so." *Cooper Motors v. Commissioners,* 131 Colo. 78, 279 P.(2d) 685; *People v. Morgan,* 79 Colo. 504, 246 Pac. 1024.

*Second.* "In construing a constitutional provision, courts should ascertain and give effect to the intent of the framers thereof and of the people who adopted it, and, in so doing, technical rules of construction should not be applied so as to defeat the objectives sought to be accomplished by the provision under consideration." *Cooper Motors v. Commissioners,* supra.

*Third.* "If separate clauses in the same constitutional or statutory enactment can by one construction be harmonized so as to produce no inconsistencies, and, by a different construction, one phrase or clause thereof becomes antagonistic and out of harmony with another, courts should adopt that construction which creates no inconsistency." *Cooper Motors v. Commissioners,* supra.

*Fourth.* "Proper construction requires that each part of a constitutional provision or statute must be read in connection with all other pertinent sections * * *." *Denver v. Sweet,* 138 Colo. 41, 329 P.2d 441.

The constitutional provision here involved contains three sentences, and each should be considered in the

light of that which is contained in the other two. The first sentence makes it clear that "senatorial and representative districts may be altered from time to time, *as public convenience may require.*" (Emphasis supplied.) The contention of petitioner would require us to hold that this provision applies only to those districts which are made up of more than one county. No such limitation on the power of the legislature to alter a district in order to serve the public convenience can logically be found in the words used in the first sentence of the section under consideration. The clear implication of that language is that to serve the public convenience senatorial and representative districts may be altered whether they are single or multiple county districts.

The second sentence of the section under consideration adds strength to the conclusion because in it we deal with distinctions to be drawn between single county districts and multiple county districts and it is required that in multiple county districts any change in such district must not operate to make it consist of non-contiguous counties.

Bearing these sections clearly in mind we next find the statement, "No county shall be divided in the formation of a senatorial or representative district." This follows the sentence which refers to multiple county districts. To give effect to all three sentences contained in the questioned constitutional provision I would give it the interpretation which was applied by the General Assembly, namely, that since every new senatorial and representative district created by the act of the legislature is entirely within a specific county, there was no "division" of the county within the meaning of the third sentence of the section. The General Assembly determined that as long as a district was within a single county it did not offend the constitution and only if a senatorial or representative district purported to take in a portion of two or more counties would there be a

"divided" county in the formation of a district. The General Assembly reasoned that more than one district within a county, in order to serve the convenience of the people, is not prohibited, but the prohibition upon their power prevents the placing of parts of two or more counties within a single district.

It cannot be seriously questioned that the "public convenience" requires the enactment of the proposed changes in the densely populated single-county districts, to a much greater degree than in those areas in which only a few senators and representatives are selected.

While reasonably minded persons may differ on the interpretation to be given the constitutional provision under consideration, the legislative interpretation is a reasonable one and under the legal principles hereinabove mentioned I would give approval to that interpretation which will uphold both the Act and the constitutional provision.

Accordingly it is my opinion that the legislative Act does not offend the Constitution of Colorado and I would discharge the rule to show cause.

The foregoing views have been rejected by the majority of this court. Although I dissent I must now assume that the Act of the legislature is unconstitutional. The majority opinion so declares in emphatic and unmistakable terms. Being unconstitutional, the Act is void. The procedures condemned as being in violation of fundamental law have had no validity at any time since the 8th day of July when the unconstitutional measure was "enacted" by the legislature and signed by the Governor under the mistaken belief that it was a proper exercise of legislative power. This act of the legislature is either good or it is bad when subjected to the test of the Colorado Constitution. The majority has condemned it under that test!

But the majority concludes that it would be expedient to temporarily suspend the effectiveness of constitutional limitations upon governmental power until an

"election" can be conducted under the provisions of the very statute which is denounced as being unconstitutional! This is an extremely dangerous doctrine. "A resort to expediency in the law is always dangerous." *City of Canon City v. Clyde James Merris,* 137 Colo. 169, 323 P.2d 614. I have great difficulty in reconciling the views expressed in the majority opinion with the words employed by the same author in *Canon City v. Merris,* supra, where we find:

"Expedience may not override the Constitution of Colorado; it should not dethrone rights guaranteed thereunder. 'If, one by one, the rights guaranteed by the federal Constitution can and must, for expediency's sake, be violated, abolished, stricken from that immortal document, and from state Constitutions, we will find ourselves governed by expediency, not laws or Constitutions, and the revolution will have come.' *State v. Arregui,* 44 Ida. 43, 254 Pac. 788, 52 A.L.R. 463. See *Gouled v. U. S.,* 255 U. S. 298, 65 L. Ed. 647, 41 Sup. Ct. 261."

The majority has said the law is unconstitutional and necessarily void for complete lack of power in the legislature to enact it. Notwithstanding this controlling conclusion, the majority opinion initiates a new doctrine for the determination of the legality of state statutes being tested by the state constitution. For lack of better name I shall call it the doctrine of "transient validity" under which a semblance of temporary effectiveness is mysteriously breathed into the nullity spawned by the legislature. It is a sort of "Here today — gone tomorrow" power to the existence of which I cannot subscribe and in the creation of which I can have no part.

As a member of this court, who cannot agree that the Act was beyond the power of the legislature to adopt, I am nevertheless bound by the decision of the majority. All federal courts are also bound by this determination. This assertion is firmly established by

decisions of the Supreme Court of the United States which are too numerous to mention by name. It is also firmly established by decisions of the courts of last resort in every state in the Union. It is also recognized by a federal statute known as the "Rules of Decisions Statute." Tit. 28 § 1652, U.S.C.A., in which it is provided that "* * * the laws of the several states, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision" in the federal courts. For a quick reference to hundreds of cases from all jurisdictions supporting this fundamental rule, I direct attention to 36 C.J.S. pages 393-402 where they are collected under a statement of the general rule which reads as follows:

"The decision of the highest court of a state as to the construction and application of its own constitution or statutes is binding on federal courts, except in so far as a federal question is involved, or unless following the state decision would conflict with the United States Constitution, treaties, or statutes."

There isn't the slightest suggestion that the question resolved by this court involves a federal question of any kind.

In carrying out the mandate of the Supreme Court of the United States in *Lucas v. Forty-fourth General Assembly*, supra, it would be a simple matter for the three-judge federal court to insure an election that provided "equal protection of the law" under the federal constitution, and at the same time be in full harmony with the provisions of the state constitution as that instrument has been construed by this court. There is no authority in the mandate of the U. S. Supreme Court which justifies the holding of an unconstitutional election at the state level in order that equal protection of the law may be secured, when an election in conformity with the state constitution can be had which also insures equal protection of the law!

This court, in my judgment, is anticipating that the federal court will disregard all the law that has ever been written thus far which is pertinent to the issue, and will order an election upon a purely state issue under procedures set up by a state law which the majority opinion says violates the state constitution. I cannot believe that so little remains of state sovereignty. If, however, the fears of the majority are justified by subsequent events, the cure for the resultant injury to state sovereignty and for the disease of usurpation of judicial power is not for this court to emasculate and destroy the protections guaranteed to the citizens of the state by the Constitution of Colorado. This court has no power to suspend provisions of the constitution for a single day, much less to order the election officials of this state to proceed in an unconstitutional manner to the election of an illegal legislative body by conducting an election under a law which is strongly denounced as being a violation of the constitution of the state!

It is said in the majority opinion: "* * * Like the chancellor, if we can find no precedent we must establish one. The court should be resourceful in fashioning a remedy commensurate with a complex situation." I cannot agree that "in fashioning a remedy" to meet a "complex situation" this court, or any federal court, in the absence of a federal question has the power to eliminate state constitutional protections for any specified length of time. The name for such judicial conduct is not "resourceful." If we are to nullify constitutional provisions on the grounds of expediency every time we have a "complex situation" the future will present many more opportunities to make use of the majority opinion as a precedent to further emasculate and destroy constitutional government. The question might well be asked: When and where do we stop the Frittering away of Constitutional Protections?

For the foregoing reasons I place of record this protest to the disposition made of this case wherein it is

said: "We stay the effect of our judgment nullifying Senate Bill No. 1 until the completion of the session of the legislature to be held in 1965."