Raymond LaDUKE, James McDowell, Don Clifton, Lisa Shay and Troy Jackson, individually and in their official capacity as members of the Board of Assessment Appeals of the State of Colorado; Board of Assessment Appeals of the State of Colorado; George D. Amaya, James M. Brewer and Sollie Raso, individually and in their official capacity as members of the Board of County Commissioners, Pueblo, Colorado, sitting as the County Board of Equalization, Pueblo County, State of Colorado; Board of County Commissioners of the County of Pueblo, sitting as the Pueblo County Board of Equalization; Michael E. Schuster, individually and in his official capacity as the Pueblo County Assessor, Petitioners,

v.

CF & I STEEL CORPORATION, Respondent.

No. 88SC340.

Supreme Court of Colorado, En Banc.

Jan. 16, 1990.

---

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Larry A. Williams, First Asst. Atty. Gen., Denver, for State petitioners.

James V. Phelps, Pueblo County Atty., Terry A. Hart and Michael M. Como, Asst. County Attys., William David Lytle, Pueblo, and S. Morris Lubow, Denver, for County petitioners.

William A. McLain, William A. McLain, P.C., Denver, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *CF & I Steel Corporation v. Patton*, 765 P.2d 586 (Colo. Ct.App.1988), affirming the order of the district court requiring the Pueblo County Assessor to revaluate the 1984 real property tax assessments of respondent CF & I Steel Corporation's manufacturing facilities. The court of appeals agreed with the district court that the partial permanent shut-down of the CF & I steel mill and the 52 percent reduction in its workforce constituted an "unusual condition," namely a "change in the use of the land," pursuant to section 39–1–104(11)(b)(I), 16B C.R.S. (1982), and therefore that the assessor was required to consider valuation factors beyond the 1977 base year. We conclude that a change in the use of the land does not include a partial shut-down of an industrial plant when a significant portion of that plant continues in operation and, therefore, we reverse the judgment of the court of appeals.

I.

Respondent CF & I Steel Corporation (CF & I), is the owner and operator of a steel production plant in Pueblo, Colorado. In the early 1980s, CF & I was faced with severe financial stress due to the depressed state of the American steel industry. In 1983, as a result of these pressures, CF & I cut back its level of steel production at the Pueblo plant, shutting down its coke plant, lime plant, ore preparation plant and its blast furnaces. Initially, the cutbacks were expected to be temporary. Therefore, CF & I kept its coke ovens on "hot idle," enabling a start-up when economic conditions became more favorable. However, in December of 1983, when CF & I decided to permanently cease production of steel from iron ore, the fire in the coke ovens was permanently extinguished. As anticipated at the time of the shut-down, the turning off of the coke ovens resulted in the collapse of their refractories. As a result, they can no longer be used to manufacture steel. Following the shut-down, CF & I reduced the number of its employees from 4,800 to 2,300.

CF & I has developed and now is implementing a plan for scrapping the closed facilities. However, subsequent to the shut-down, CF & I continued to use a part of the plant in the steel manufacturing process. Raw steel was produced through the melting of salvaged steel in the plant's electric furnaces. Also, CF & I's finished product mills continued to produce rails, steel pipe, wire and rods. Both the peti-

tioners and CF & I agree to the characterization of the present steel plant as a "mini-mill."

In 1984, the Pueblo County Assessor (the Assessor), completed an assessment of the real property of CF & I's Pueblo plant using a base year of 1977, as required by section 39–1–104(10)(a), 16B C.R.S. (1982). In 1983, the Assessor had revised the commercial assessments which had been made on the previous base year of 1973 by applying a multiplier which represented the average increase in the value of commercial properties in Pueblo County between 1973 and 1976. Using that formula, the Assessor determined that the actual value of CF & I real and personal property for purposes of the 1977 base year was 105.6 million dollars.

CF & I appealed the determination of the Assessor to the Pueblo County Board of Commissioners, sitting as the Board of Equalization (BOE) pursuant to section 39–8–101, 16B C.R.S. (1982). The BOE upheld the assessment and CF & I appealed that decision pursuant to section 39–8–108(1) to the Board of Assessment Appeals (BAA). The BAA, who together with its members in their individual capacities as well as the BOE together with its members in their individual capacities are the petitioners in this case, again upheld the assessment, and CF & I sought judicial review in the Pueblo County District Court pursuant to section 39–8–108(2). CF & I challenged both the Assessor's original determination of the 1977 base year level of value as well as the failure of the Assessor to adjust that level of value in 1984 because of the existence of an "unusual condition."

The district court found that in computing the 1977 base year level of value, the Assessor improperly had relied exclusively on the "market approach" in assessing CF & I's real property. The court held that section 39–1–103(5)(a), 16B C.R.S. (1989 Supp.), required the Assessor also to consider the "income approach" in making its valuation of the CF & I property. Further,

the district court found that the 1983 permanent shut-down of a portion of the CF & I facility was an "unusual condition" which required the Assessor to consider valuation factors beyond the 1977 base year. The court ordered the Assessor on remand to conduct a revaluation: (i) utilizing and documenting all applicable approaches to value; (ii) considering all obsolescence factors affecting CF & I's real and personal property; (iii) considering business profits to determine the economic obsolescence suffered, as required by the income approach to value; (iv) recognizing the value concept of the going concern; and (v) incorporating depreciation factors beyond the base year in the valuation of CF & I's real property.

The court of appeals affirmed in part and reversed in part the decision of the district court.[1] It agreed that the administrative decision upholding the 1984 assessment was arbitrary and capricious because it failed to account for an unusual condition, namely the partial permanent shut-down of the steel plant, in assessing the CF & I property pursuant to section 39–1–104(11)(b)(I). However, the court of appeals reversed the portion of the district court judgment rejecting the Assessor's original 1977 valuation. We granted the BAA's petition for certiorari only to consider whether the permanent shut-down of a portion of the CF & I facility constituted an "unusual condition" which required the Assessor to consider valuation factors beyond the 1977 base year in determining CF & I's 1984 assessment.

## II.

Before considering the merits of CF & I's argument that the "transformation" of the CF & I plant from an "integrated steel plant" to a "mini-mill" constituted an "unusual condition," it is necessary to review briefly the law governing the assessing of valuation for most commercial property. First, under section 39–1–103(5)(a), 16B C.R.S. (1989 Supp.), the Assessor deter-

---

1. CF & I also appealed the Assessor's 1985 assessment of its Pueblo County plant, and the trial court rejected the 1985 assessment. Although the BAA appealed that decision to the court of appeals, the appeal was dismissed because it was not filed in a timely fashion. Therefore, the validity of the 1985 assessment is not before us.

mines the "actual" value of the property by "appropriate consideration" of the three methods of real property assessment: the cost approach, the market approach, and the income approach. *Carrara Place, Ltd. v. Arapahoe County Board of Equalization*, 761 P.2d 197 (Colo.1988). Second, the Assessor determines a "valuation for assessment," which for 1984 was 29 per cent of the actual value. § 39–1–104(1), 16B C.R.S. (1989 Supp.).

The actual value is the value of the real property in the calendar year immediately preceding the "base year." § 39–1–104(9)(c). The base year relevant here under section 39–1–104(10)(a) is 1977. Under section 39–1–104(9)(c), the Assessor applies the appropriate valuation approaches of section 39–1–103(5) to the calendar year immediately preceding the base year. Thus, a proper application of the statute in this case required the Assessor to determine the value of the real property at the CF & I plant as of 1976, and to assess 1984 taxes with respect to that 1976 value.

The advantage of the base year method of assessment is that the Assessor need not revaluate each property every year even though particular properties may have increased or decreased in value during a particular year. *Carrara Place*, 761 P.2d at 200. Although a taxpayer's property may have increased or decreased in value, the taxpayer pays taxes on the basis of its property's value during the year preceding the base year, and not on the basis of the value during that tax year. Thus, when property values are rising in an economic upturn the base year method works in favor of the taxpayer by requiring that its property taxes be calculated on the lower base year value and not on the higher tax year value. On the other hand, when property values are falling, the base year method works to the disadvantage of the taxpayer by requiring that property taxes be calculated on the higher property values of the base year even though those values subsequently declined. The legislature has provided an exception to the general base

year rule, allowing revaluation in those circumstances in which it deemed that a change in the property or the property's use rendered application of the base year value unjust. *Carrara Place*, 761 P.2d at 201. CF & I claims that this is such a case and that therefore the Assessor should not have relied solely on the base year of 1977 in determining CF & I's property taxes for 1984.

Section 39–1–104(11)(b)(I) establishes the exception to the normal requirement that property taxes be determined under the base year provisions. That section provides in relevant part:

> The provisions of subsections (9) and (10) [establishing the base year method] of this section are not intended to prevent the assessor from taking into account, in determining actual value during the intervening years between base years, any unusual conditions in or related to any real property which would result in an increase or decrease in actual value. For the purposes of this paragraph (b), *an unusual condition which could result in an increase or decrease in actual value is limited to the installation of an on-site improvement, addition to or remodeling of a structure, change of use of the,....* When taking into account such unusual conditions which would increase or decrease the actual value of a property, the assessor must relate such changes to the base year level of values as if the conditions had existed at that time.

(Emphasis added.) CF & I argues and the court of appeals agreed that the permanent shut-down of a portion of the steel mill and the subsequent reduction of 52 percent in the number of its employees constituted an "unusual condition," namely a change in the use of the land. *CF & I Steel Corp.*, 765 P.2d at 588. The BAA disagrees, arguing that the shut-down of a portion of the CF & I plant does not constitute a change in the use of the land because in 1984, as in 1976, the real property in question continued to be used for steel production albeit

less intensively than in 1976.[2] We agree with the position of the BAA.

Our primary task in construing a statute is to determine and give effect to the intent of the general assembly, *Kern v. Gebhardt*, 746 P.2d 1340, 1344 (Colo.1987). If possible we must try to interpret statutory terms in accordance with their commonly accepted meaning. *Id.* Two facts are immediately apparent from the language of section 39–1–104(11)(b)(I). First, the legislature has given a narrow and expressly limited definition to the statutory exception of an "unusual condition." The exception is restricted to the enumerated circumstances and we are not free to adopt additional "unusual conditions." Second, the only "unusual condition" which might be applicable in this case is a "change in the use of the land." Thus, we must determine whether the partial permanent shutdown of the CF & I plant constituted a change in use of the land.

In *Carrara Place* we rejected the taxpayer's argument that substantially higher vacancy rates for rental office space in 1985 than in 1976 were a "changed condition" which required consideration of 1985 economic data, which were more favorable to the taxpayer. We recognized that such an interpretation contradicted "the plain language of section 39–1–104(11)(b)(I) expressly limiting the changed conditions that can justify a revaluation." *Carrara Place*, 761 P.2d at 201. However, we did not specifically consider in *Carrara Place* whether such changed economic conditions constituted a change in the use of the land.

The court of appeals considered the term "change in use of the land" in *Board of County Commissioners v. Colorado Board of Assessment Appeals*, 628 P.2d 156 (Colo.Ct.App.1981), and held that the recognition by statute of a time share estate in a condominium as a distinct interest in real property did not constitute a change in use of the land with respect to properties which had functioned as time share estates

prior to the enactment of the statute. *See also Benbrook v. Board of Assessment Appeals*, 695 P.2d 801 (Colo.Ct.App.1984), *aff'd* 735 P.2d 860 (Colo.1987) (assessor cannot increase assessment based on claim that conversion of apartments into condominiums constituted an unusual condition).[3] The court of appeals in *Board of County Commissioners v. Colorado Board of Assessment Appeals* did not further define the term "change in use of the land."

We note that by its terms the statute applies to changes of use of the "land." Elsewhere throughout the provisions governing property taxes "land" is given a technical meaning and is distinguished from "improvements." For example, section 39–1–104(11)(b)(I) provides that the installation of an on-site improvement is also an "unusual condition." Further, the legislature has distinguished for valuation purposes between parcels of land and improvements. Section 39–5–104 requires that each parcel of land and each town or city lot shall be separately appraised and valued, except when two or more adjoining lots or parcels are owned by the same person, in which event they may be appraised either separately or together. Section 39–5–105(1), on the other hand, requires that most improvements be valued separately from the land.

Thus, the legislature clearly distinguished the valuation of "land" from the valuation of "improvements." CF & I did not object to the Assessor's valuation of its land, but rather to the valuation of its improvements, namely the shut-down portions of the steel production facilities. CF & I urges in effect that we construe the phrase "change in use of land" to include "change in use of improvements." However, such a construction of section 39–1–104(1)(b)(I) would not faithfully adhere to that section's plain language.

Under the facts of this case, the use of the land did not change. In 1976 the CF & I land was being used as a site for an

---

2. As noted above, under section 39–1–104(9)(c) the actual value of property is the value of property in the year preceding the base year.

3. Section 39–1–104(11)(b)(I) was subsequently amended to include within the definition of "unusual condition" the statutory "creation of a condominium ownership of real property."

industrial plant producing steel. At the time of the 1984 assessment, the land was still being used as a site for an industrial plant producing steel, although admittedly the use was less intensive than in 1976.

As shown by this case and *Carrara Place*, often there will be significant changes in the intensity of the use of commercial property between the year preceding the base year and the year of the assessment. If all such changes must be taken into account by the Assessor then the entire base year scheme will be negated. Here the record indicates that the 1984 use, though significantly lessened from the 1976 use, still involved the operation of a steel plant employing 2,300 employees. Clearly this industrial undertaking remains one of the largest in Pueblo County and as in 1976, continues to produce a very significant amount of steel and other related products. Such a less intensive use of the land does not constitute a change in the use of the land for purposes of section 39–1–104(11)(b)(I).

Our holding today is bolstered by the fact that the legislature subsequently expanded the list of unusual conditions to cover economic obsolescence. In 1987 section 39–1–104(11)(b)(I) was amended to include in the definition of unusual condition "the ending of the economic life of an improvement with only salvage value remaining." Ch. 285, § 1, § 39–1–104(11)(b)(I), 1987 Colo.Sess.Laws 1385. The added statutory language fairly describes the CF & I partial shutdown. CF & I presented uncontradicted evidence here that the permanent shut-down of a portion of the steelmaking facilities became necessary because of CF & I's inability to produce steel in a cost-effective manner. CF & I's own private assessments revealed that the shut-down equipment was largely "functionally obsolete" and only had value as "scrap."

The year at issue is 1984 and the economic obsolescence amendment is limited, by

its terms, to tax years 1987 through 1992.[4] Nevertheless, CF & I argues that the 1987 amendment was not a change in the law which would preclude construing the term "change in use of the land" to cover the facts of this case. We disagree. There is a presumption that when a statute is amended there is an intent to change the law. *People v. Hale*, 654 P.2d 849 (Colo. 1982). Sands, *Sutherland on Statutes and Statutory Construction*, § 22.30 (4th ed. 1985 Rev.). This general principle applies with special force here because, as discussed above, the legislature defined unusual condition by enumerating an exclusive list of qualifying circumstances. If the list had been merely descriptive (e.g., if the list were preceded by the familiar phrase "including but not limited to"), CF & I's argument might be more persuasive. We believe this amendment indicates that for tax years prior to 1987, an unusual condition did not cover the circumstances present in this case.

We conclude, in light of this statutory revision, and in light of the plain language of the statute, that section 39–1–104(11)(b)(I) does not include within the meaning of the term "change in use of the land" the shut-down of portions of an industrial plant, when a substantial portion of that plant continues in operation. We reverse the court of appeals' judgment insofar as it found that the partial permanent shutdown of the CF & I plant constituted a change in use of the land. We remand this case to that court with directions to return the case to the Pueblo District Court so that it may reinstate the decision of the BAA upholding the 1984 assessment of CF & I's Pueblo County real property.

ERICKSON, J., does not participate.

4. We also note that pursuant to section 39–1–104(11)(b)(I), beginning in 1989, "any other occurrence, condition, factor, act or change which results in the actual value of the property as of June 30 of the preceding year being less than or greater than the correct level of value by more than ten percent of the correct level of value shall also be an unusual condition." Like the economic obsolescence amendment discussed above, this amendment is inapplicable to the tax year at issue in this case.