Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 30, 2023

**2023 CO 26**

**No. 22SC798, *MJB Motels LLC v. Cnty. of Jefferson Bd. of Equalization*—Property—Taxation—COVID-19.**

Section 39-1-104(11)(b)(I), C.R.S. (2022), creates an exception to Colorado's two-year reassessment cycle, instructing assessors to revalue property in the event of "unusual conditions in or related to any real property which would result in an increase or decrease in actual value." Commercial property owners in Jefferson County sued to compel the county assessor to revalue their properties for the 2020 tax year, arguing that COVID-19 and various state and local public health orders issued in response constituted "unusual conditions" under the statute.

On this appeal from a district court order, the supreme court now holds that COVID-19 was not a "detrimental[] act of nature," and the public health orders issued in response were not "regulations restricting . . . the use of the land" under section 39-1-104(11)(b)(I). Thus, the assessor was not required to revalue the

taxpayers' properties for the 2020 tax year.  Accordingly, the court affirms the

district court order dismissing the complaint for failure to state a claim.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2023 CO 26

**Supreme Court Case No. 22SC798**
*C.A.R. 50 Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 21CA1731
Jefferson County District Court Case No. 20CV31506
Honorable Lindsay L. VanGilder, Judge

## Petitioners:

MJB Motels LLC; Samarah Investments LLC; Meek Enterprises LLC; Tosh Amir; MW Real Estate LLC; Palmetto Club Associates LLP; Winddrift Associates LLC; Sheridan LLC; Pickerings LLC; 2220 Rand, LLC; FGS Retail & Commercial Operations LLC; Firestone Real Estate Leasing Company; Kong Real Estate Holdings LLC; SFCA LLC; Rocky Mountain School of Art Inc; Schreivogel Investments LLC; Baron Ventures LLC; 875 Tabor Street LLC; Garney Holding Co; Dean Carson Grape St LLC; Golden Automotive Group Holdings LLC; Public Service Employees Credit Union; MPSC Limited Liability; Marketplace at Ken Caryl LTD Liability Co; GEP Investments Inc; Sooper Credit Union; Sartorius Corporation; Texas Roadhouse Holdings LLC; TR Alkire LLC; DLDL LLC; Deep Sky Holdings LLC; Software Bisque Inc; Alma D Gianolini Grandchildrens Trust; BTP 10445 Town Center LLC; New World Ventures LLC; Lee Doud Inc; Fawcett Enterprises LLC; B C S Community Credit Union; 9797 West Colfax LLC; Lifeloc Technologies Inc; Robb Street LLC; Brettler Real Estate Inc; Mauldin 50 LLP; The Mountainview Group LLC; Kastin Company, LLC; Keystone Group LLC; Suman Properties LLC; Hill Industries LLC; Hill Real Estate Rental LLC; Buffalo Partners LP; Raeouf Mohammad; Tehrani Simin; Sautter Arvada School Property LLC; Vivian Fortress LLC; Carol Pack Living Trust; Simms LLC; Norton Frickey Family Partnership; Kim R Haarberg; North Bear Meadows LLC; 1600 Garrison Street LLC; 9201 West Colfax Avenue LLC; Braman Colorado European Imports Inc.; 6833 Joyce Street LLC; Maxson Holdings LLC; Denver Area Council Boy Scouts of America; Southwestern Investments LLC; MNR LLC; J&S Holdings LLC; Showme Mountain Investors

LLC; DDK Properties LLC; Janey Blehm; Terry Blehm; Surkalo Harry Mtarri; Paul B Trost; Bear Land Holdings LLC; Ivarsson LLC; Stern Lawrence Holdings LLC; Parkview Place LLC; United Land Investments LLC; Partners Credit Union; Solera National Bank; 6350 AEF LLC; Semcken Commercial LLC; Garlock Pipeline Technologies Inc; 10639 Bradford LLC; Castle Court LLC; 430 Indiana LLC; Going Green LLC; Signature Assisted Living LP; FFT Holdings LLC; SCFT Holdings LLC; Westland LLC; Ralston Development Corporation; Premium Panels Inc; Associated Bodywork & Massage Professionals; Yukon Court Apartments Holding Company LLC; Terra Village Apartments Holding Company LLC; Wellington Resources LLC; 1150 Catamount LLC; 4240 Kipling LLC; Summit Commercial Properties I LLC; 150 Capital Drive LLC; Domenico Real Estate Partnership III LLP; Maxim United LLC; PWN 1 LLC; Tebo Superstore LLC; 15000 W Kendrick St LLC; Morton Properties LLC; Hennessey; CFC Investments LLC; 4301 Wadsworth LLC; Doris N Guernsey; Paul L Guernsey; Enger Enterprises LLC; Warren Family Funeral Homes Inc; LHI Group LLC; 55 West LLC; TF Holdings LLC; UGWUD Properties LLC; Clay & Imes Inc; Creekside West Partnership LLP; Cheryl Rogers; Aleksander Staninovski & Ivka Staninovski Trust; Bridgestone Company LLC; Vlade Sekulovski; Tome Nechovski Living Trust; LFP&JP JJC; El Rancho Colorado Restaurant LLC,

v.

**Respondents:**

County of Jefferson Board of Equalization and Scott Kersgaard, Jefferson County Assessor.

---

**Order Affirmed**
*en banc*
May 30, 2023

---

**Attorneys for Petitioners:**
Law Offices of James P. Bick, Jr PC
James P. Bick, Jr.
     *Chesterfield, Missouri*

Hutchinson Black and Cook, LLC
Glen F. Gordon

Matthew A. Simonsen
  *Boulder, Colorado*


**Attorneys for Respondents:**
Jefferson County Attorney's Office
Amber J. Munck, Assistant County Attorney
Jason W. Soronson, Assistant County Attorney
  *Golden, Colorado*


**Attorneys for Amici Curiae Assessor for Larimer County; Assessors and Boards of Equalization for Adams County, Arapahoe County, Boulder County, El Paso County, Mesa County, Routt County, Eagle County, Weld County, the City and County of Broomfield, and the City and County of Denver; and Colorado Assessor's Association:**

Adams County Attorney's Office
Meredith P. Van Horn, Assistant County Attorney
  *Brighton, Colorado*

Arapahoe County Attorney's Office
Ronald A. Carl, County Attorney
Benjamin P. Swartzendruber, Assistant County Attorney
  *Littleton Colorado*

Boulder County Attorney's Office
Michael A. Koertje, Assistant County Attorney
  *Boulder, Colorado*

Office of the City & County Attorney of the City & County of Broomfield
Patricia W. Gilbert, Deputy City and County Attorney
  *Broomfield, Colorado*

Denver City Attorney's Office
Charles T. Solomon, Assistant County Attorney
Paige A. Arrants, Assistant County Attorney
  *Denver, Colorado*

Kathryn L. Schroeder

3

*Pueblo West, Colorado*

El Paso County Attorney's Office
Steven Klaffky, Senior Assistant County Attorney
*Colorado Springs, Colorado*

Larimer County Attorney's Office
David P. Ayraud, Deputy County Attorney
*Fort Collins, Colorado*

Mesa County Attorney's Office
Andrea Nina Atencio, Chief Deputy County Attorney—Civil Division
John R. Rhoads, Assistant County Attorney II
*Grand Junction, Colorado*

Routt County Attorney's Office
Erick Knaus, County Attorney
Lynaia M. South, Senior Assistant County Attorney
*Steamboat Springs, Colorado*

Eagle County Attorney's Office
Christina C. Hooper, Senior Assistant County Attorney
*Eagle, Colorado*

Weld County Attorney's Office
Karin McDougal, Assistant County Attorney
*Greeley, Colorado*


**Attorneys for Amicus Curiae Colorado Property Tax Administrator:**
Philip J. Weiser, Attorney General
Robert H. Dodd, First Assistant Attorney General
John H. Ridge, Senior Assistant Attorney General
Jessica E. Ross, Assistant Attorney General
*Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART**, **JUSTICE SAMOUR**, and **JUSTICE BERKENKOTTER** joined.

5

JUSTICE MÁRQUEZ delivered the Opinion of the Court.

¶1 This is one of several cases filed in Colorado in which commercial property owners have sued to compel the county assessor to revalue their properties and lower their property tax assessments for the 2020 tax year to account for the economic impacts of the COVID-19 pandemic. This case concerns the valuation of hundreds of parcels of commercial real property located in Jefferson County. The taxpayers here—and in the other cases—contend that the pandemic and various state and local public health orders issued in response were "unusual conditions" that required revaluation of their properties under section 39-1-104(11)(b)(I), C.R.S. (2022).

¶2 We accepted jurisdiction under section 13-4-109, C.R.S. (2022), in four of these cases to consider how the "unusual conditions" exception in section 39-1-104(11)(b)(I) applies to the circumstances created by the COVID-19 pandemic during the 2020 property tax year. *See Larimer Cnty. Bd. of Equalization v. 1303 Frontage Holdings LLC*, 2023 CO 28, __ P.3d __; *Educhildren LLC v. Cnty. of Douglas Bd. of Equalization*, 2023 CO 29, __ P.3d __; *Hunter Douglas Inc. v. City & Cnty. of Broomfield Bd. of Equalization*, 2023 CO 27, __ P.3d __. In *1303 Frontage*, we address *when* an assessor must revalue property based on an unusual condition. There, we conclude that article 1 of title 39 does not require an assessor to revalue real property when an unusual condition occurs after the January 1 assessment

date for the intervening (second) year of the reassessment cycle. *See 1303 Frontage*, ¶ 90; *accord Educhildren*, ¶ 5.

¶3    In this case and in *Hunter Douglas*, we consider whether the COVID-19 pandemic and the public health orders issued in response constituted "unusual conditions" for purposes of section 39-1-104(11)(b)(I).[1] We conclude they did not. Specifically, we hold that COVID-19 was not a "detrimental act[] of nature," and the orders issued in response to COVID-19 were not "regulations restricting . . . the use of the land" under section 39-1-104(11)(b)(I). Therefore, section 39-1-104(11)(b)(I) did not require the Jefferson County Assessor to revalue the taxpayers' 2020 property valuations, and it did not require the Board of

---

[1] We accepted jurisdiction under section 13-4-109 to review the following issues:

1. Whether the district court erred in concluding, as a matter of law, that the COVID-19 pandemic was not a detrimental act of nature as contemplated by C.R.S. § 39-1-104(11)(b)(I) and therefore not an "unusual condition" thereunder.

2. Whether the district court erred in concluding, as a matter of law, that the various regulations imposed by the Governor and Public Health authorities in response to the pandemic were not regulations restricting or increasing the use of land as contemplated by C.R.S. § 39-1-104(11)(b)(I) and therefore not an "unusual condition" thereunder.

3. Whether the district court erred in dismissing Taxpayers' complaint on the basis of factual assumptions and speculation.

Equalization to correct the Assessor's valuations. Accordingly, we affirm the order of the district court dismissing the complaint for failure to state a claim.

## I. Background

¶4 The Colorado Constitution sets forth a broad directive to achieve "just and equalized valuations" for taxing real and personal property:

> Each property tax levy shall be uniform upon all real and personal property . . . . The actual value of all real and personal property . . . shall be determined under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of all real and personal property.

Colo. Const. art. X, § 3(1)(a).

¶5 Pursuant to this mandate, the General Assembly has enacted a statutory framework establishing a backward-looking, two-year reassessment cycle for property taxes in Colorado. § 39-1-104(10.2)(a). In an odd-numbered year (the first year of the two-year cycle), the assessor in the county where the property is located determines the "actual value" of the property, which the assessor uses to determine a "valuation for assessment." § 39-1-104(1)(a); § 39-1-104(1.8)(b); § 39-1-104(10.2)(a). The actual value does not reflect the current value of the property on the January 1 assessment date. § 39-1-105, C.R.S. (2022). Rather, it is based on data gathered during a one-and-one-half year period "immediately prior to July 1 immediately preceding the assessment date." § 39-1-104(10.2)(d). For example, assessors calculated the actual value for 2019 tax assessments using a

8

data-gathering period of January 1, 2017, to June 30, 2018. *See id.*; *see also 1303 Frontage,* ¶ 13 (describing the data-gathering periods for tax assessments for the 2019 through 2024 tax years).

¶6 Generally, property valuations are calculated only once every two years. That is, the actual value for the first (odd-numbered) year carries over to the second (even-numbered) year of the biennial reassessment cycle. § 39-1-104(10.2)(a). However, section 39-1-104(11)(b)(I) instructs assessors to revalue a property before the next odd-year assessment date under certain limited circumstances, including where "unusual conditions in or related to any real property . . . would result in an increase or decrease in actual value."[2] This "unusual conditions" exception allows revaluation where "a change in the property or the property's use rendered application of the base year value unjust." *LaDuke v. CF & I Steel Corp.,* 785 P.2d 605, 608 (Colo. 1990).

¶7 The "unusual conditions" that require an assessor to reassess the actual value of a property are expressly limited to:

> [1] the installation of an on-site improvement, [2] the ending of the economic life of an improvement with only salvage value remaining,

---

[2] Additional exceptions to the two-year reassessment cycle include the total destruction of property and a clerical error. *See 1303 Frontage*, ¶ 14 (first citing § 39-1-123, C.R.S. (2022); and then citing *Thibodeau v. Denver Cnty. Bd. of Comm'rs*, 2018 COA 124, ¶ 12, 428 P.3d 706, 709).

[3] the addition to or remodeling of a structure, [4] a change of use of the land, [5] the creation of a condominium ownership of real property as recognized in the "Condominium Ownership Act", article 33 of title 38, C.R.S., [6] *any new regulations restricting* or increasing *the use of the land,* or a combination thereof, [7] the installation and operation of surface equipment relating to oil and gas wells on agricultural land, [8] *any detrimental acts of nature,* and [9] any damage due to accident, vandalism, fire, or explosion.

§ 39-1-104(11)(b)(I) (emphases added); *see also LaDuke*, 785 P.2d at 609 ("[W]e are not free to adopt additional 'unusual conditions.'").

¶8     In interpreting section 39-1-104(11)(b)(I), we also look to the Assessors' Reference Library ("ARL"), which describes "assessment policies and procedures for real property valuation according to the Colorado Constitution and statutes." 3 Colo. Div. of Prop. Tax'n & Dep't of Loc. Affs., *Assessors' Reference Library: Real Property Valuation Manual* ("3 ARL") Preface (Rev. Jan. 2023). The Colorado Property Tax Administrator ("Administrator") publishes the ARL pursuant to section 39-2-109(1)(e), C.R.S. (2022), which authorizes the Administrator "[t]o prepare and publish from time to time manuals, appraisal procedures, and instructions." The ARL is binding on the county assessors charged with administering the statute. *Huddleston v. Grand Cnty. Bd. of Equalization*, 913 P.2d 15, 18 (Colo. 1996). Although we may defer to an administrative agency's reasonable interpretation of that statute, *Gessler v. Colo. Common Cause*, 2014 CO 44, ¶ 7, 327 P.3d 232, 235, we are not bound by its interpretation. *BP Am. Prod. Co. v. Colo. Dep't of Revenue*, 2016 CO 23, ¶ 15, 369 P.3d 281, 285.

¶9     Having outlined the constitutional and statutory authority that guides our inquiry, we now turn to the facts.

## II.  Facts and Procedural History

¶10     The petitioners in this case are taxpayers who own commercial real property located in Jefferson County.  On December 10, 2020, the taxpayers sued the County of Jefferson Board of Equalization and the County of Jefferson Assessor, Scott Kersgaard, (collectively, "the County") in Jefferson County District Court.  The complaint alleges that beginning in March 2020, in response to the COVID-19 pandemic, Colorado state and local authorities began issuing numerous "executive orders and other regulations restricting the use and access to Plaintiffs' properties."  According to the taxpayers, the pandemic and the related orders issued by the Governor, the Colorado Department of Public Health & Environment, and Jefferson County Public Health (collectively, "public health orders") amounted to "unusual conditions" under section 39-1-104(11)(b)(I) that required the Jefferson County Assessor to revalue their properties and required the Board of Equalization to lower the Assessor's valuations of their properties for the 2020 tax year.

¶11     The taxpayers' complaint sought mandamus relief, declaratory relief, and de novo review of section 39-1-104(11)(b)(I).  The taxpayers focused on two of the enumerated unusual conditions in section 39-1-104(11)(b)(I).  First, they argued

11

that the COVID-19 pandemic was a detrimental act of nature. Second, they argued that the public health orders issued in response to the COVID-19 pandemic constituted new regulations restricting the use of the land. The taxpayers attached their estimations of the value of their properties for the 2020 tax year, which were—across the board—50% less than the Assessor's valuations.

¶12 In June 2021, the County filed a motion to dismiss, arguing that (1) the taxpayers failed to state a claim for relief; (2) the COVID-19 pandemic and public health orders occurred after the statutory timeframe for consideration of an unusual condition for the 2020 tax year; and (3) the COVID-19 pandemic and related public health orders were not unusual conditions.

¶13 On September 23, 2021, the district court dismissed the taxpayers' complaint on the ground that the pandemic and public health orders did not qualify as unusual conditions. The district court concluded that the COVID-19 pandemic was not a detrimental act of nature because unlike direct, tangible forces such as forest fires, landslides, and immediate erosion problems—the examples provided by the ARL—the pandemic's impacts on real property were "indirect and intangible."

¶14 The district court further found that the public health orders did not qualify as regulations restricting the use of the land because the orders did not regulate the land itself. The court reasoned that, "[w]hile the practical effect of those

12

regulations may have prevented Plaintiffs, in their capacities as owners of the improvements on the Subject properties, from using those improvements for a time, the 'use of *the land*' was never directly restricted."

¶15 Having concluded as a matter of law that the pandemic and public health orders were not unusual conditions, the district court dismissed the taxpayers' complaint without reaching the County's remaining arguments.

¶16 The taxpayers appealed. The court of appeals filed a motion for determination of jurisdiction, requesting that this case and its three companion cases be referred to this court because they raise issues of significant public importance. *See* §§ 13-4-109 to -110, C.R.S. (2022); C.A.R. 50(a). In November 2022, we granted the motion and accepted jurisdiction.

## III. Analysis

¶17 After setting forth the standards of review, we explain why the COVID-19 pandemic did not constitute a "detrimental act[] of nature." *See* § 39-1-104(11)(b)(I). Then, we describe why the public health orders issued in response were not "regulations restricting . . . the use of the land." *See id.* Finally, we discuss prior cases stating that economic fluctuations are not unusual conditions, which underscores our conclusion that the COVID-19 pandemic did not trigger revaluation under section 39-1-104(11)(b)(I).

## A. Standards of Review

¶18   We review rulings on motions to dismiss de novo. *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010); *Allen v. Steele*, 252 P.3d 476, 481 (Colo. 2011). Under C.R.C.P. 12(b)(5), defendants may move to dismiss for "failure to state a claim upon which relief can be granted." "[W]here the plaintiff's factual allegations cannot, as a matter of law, support a claim for relief," the trial court properly grants a C.R.C.P. 12(b)(5) motion. *Bly*, 241 P.3d at 533. Factual allegations in a complaint "must be enough to raise a right to relief 'above the speculative level,' and provide 'plausible grounds to infer'" a situation giving rise to a cause of action. *Warne v. Hall*, 2016 CO 50, ¶ 9, 373 P.3d 588, 591 (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

¶19   We also review de novo questions of statutory interpretation. *Jefferson Cnty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo. 2010). "We begin by looking to the express language of the statute, construing words and phrases according to grammar and common usage." *Id.* If the statute's language is unambiguous and "the intent appears with reasonable certainty, our analysis is complete." *Id.*

## B. Detrimental Act of Nature

¶20   The taxpayers first contend that the COVID-19 pandemic was a "detrimental act[] of nature" under section 39-1-104(11)(b)(I). They start with the

14

definition of "detrimental"—"[c]ausing harm, damage, or loss; injurious or hurtful"—and observe that the COVID-19 pandemic caused harm to communities, damage to the economy, and loss of life. *Detrimental,* Black's Law Dictionary (11th ed. 2019). The taxpayers then borrow the definition of "natural cause" from elsewhere in the tax code to argue that COVID-19 was an act of nature. *See* § 39-1-102(8.4), C.R.S. (2022) (defining "[n]atural cause" as "fire, explosion, flood, tornado, action of the elements, act of war or terror, or similar cause beyond the control of and not caused by the party holding title to the property destroyed"). According to the taxpayers, because the COVID-19 pandemic fits within definitions of "detrimental" and "act of nature," it was a "detrimental act[] of nature" for purposes of section 39-1-104(11)(b)(I).

¶21 We disagree. The exception in section 39-1-104(11)(b)(I) instructs assessors to take into account "any unusual conditions in or related to any real property which would result in an increase or decrease in actual value." To fall within this provision, the unusual condition must be *both* an "act of nature" and "in or related to any real property." *Id.* An "act of nature" is "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, flood, or tornado." *Act of nature*, Black's Law Dictionary (11th ed. 2019) (referring to the definition of an "act of God"). And to be "in or related to any real property,"

15

an act must be "[c]onnected in some way" to real property. *See Related*, Black's Law Dictionary (11th ed. 2019).

¶22 COVID-19 meets neither of these requirements. COVID-19 is "a respiratory disease caused by a novel coronavirus." *See In re Interrogatory on House Joint Resol. 20-1006*, 2020 CO 23, ¶ 5, 500 P.3d 1053, 1056 (citing Colo. Exec. Order No. D 2020 003, at 1 (Mar. 11, 2020), https://www.colorado.gov/governor/sites/default/ files/inline-files/D%202020%20003%20Declaring%20a%20Disaster% 20Emergency_1.pdf [https://perma.cc/66FD-5MUY]). On March 11, 2020, the World Health Organization officially declared COVID-19 to be a pandemic. *Id.* at ¶ 8, 500 P.3d at 1057 (citing H.R.J. Res. 20-1006, 72d Gen. Assemb., 2d Reg. Sess., at 1 (Colo. 2020)). Whether COVID-19 is viewed as a virus or a pandemic, it did not resemble the natural events—earthquakes, floods, and tornados—that we consider acts of nature. *See Act of nature,* Black's Law Dictionary (11th ed. 2019).

¶23 Moreover, the COVID-19 pandemic was not "in or related to any real property." § 39-1-104(11)(b)(I). COVID-19 may have infected people who were on the property. *See In re Interrogatory*, ¶ 5, 500 P.3d at 1056 ("COVID-19 is transmitted by close exposure to a person with the virus, particularly an infected person's respiratory droplets from coughing or sneezing."). But COVID-19 did not infect the property itself. Because the COVID-19 pandemic was not an act of

16

nature and because it was not "in or related to" the taxpayers' *properties*, COVID-19 was not an "unusual condition" for purposes of section 39-1-104(11)(b)(I).

¶24 The Administrator's interpretation of the statute bolsters our conclusion. It lists as examples of "[d]etrimental acts of nature" forest fires, landslides, and immediate erosion problems. 3 ARL 1.10. These examples share three qualities. First, as the district court observed, they are "direct, tangible forces . . . capable of 'diminish[ing] the use or availability of a parcel of land.'" (Quoting 3 ARL 1.10.) Second, they affect properties in a limited geographic area. And third, their impact occurs in a defined window of time. As a virus, COVID-19 is different in all three respects: It does not directly affect the use or availability of real property, its impact is worldwide, and its duration has spanned years.

¶25 These differences are relevant to the practical application of section 39-1-104(11)(b)(I). As discussed, the existence of an unusual condition permits an otherwise prohibited mid-cycle revaluation of a property. Such revaluation is feasible in the event of a forest fire, landslide, or immediate erosion problem that affects a limited number of properties. But requiring a mid-cycle revaluation based on a global pandemic would be absurd, both because *every* property would be at least indirectly affected by it and because COVID-19 is not a single event (like a landslide); rather, the intangible impacts of COVID-19 have spanned years. It is therefore not clear under the taxpayers' interpretation when—

17

or how many times—an assessor would have to undertake such revaluation. (Each time a new or revised public health order issues?)

¶26 The taxpayers contend that even if COVID-19 does not resemble the events listed in the ARL definition, the pandemic nevertheless "fits squarely within the ARL catchall provision" of "other natural occurrences that would diminish the use or availability of a parcel of land." But just as this court cannot add unusual conditions to section 39-1-104(11)(b)(I)'s exhaustive list, neither can the Tax Administrator. So the "other natural occurrences" provision in the ARL is necessarily limited to events that are "in or related to any real property." As discussed, COVID-19 was not such an event.

¶27 In light of the plain language of the statute, as well as the Tax Administrator's interpretation, we conclude that COVID-19 was not a "detrimental act[] of nature" for purposes of section 39-1-104(11)(b)(I).

## C. Regulations Restricting the Use of the Land

¶28 Next, the taxpayers contend that the public health orders issued in response to COVID-19 constituted regulations restricting the use of their land that triggered revaluation under section 39-1-104(11)(b)(I). Their complaint references 141 orders issued by the Governor, 28 orders issued by the Colorado Department of Public Health & Environment, and orders issued by Jefferson County Public

Health related to the COVID-19 pandemic.[3]  The taxpayers contend that the orders

were "regulations" under the plain meaning of the word and that "[m]any of the[]

_____

[3] In their briefing to this court, the taxpayers focus on seven orders: (1) Executive Order D 2020-017, directing non-critical businesses "to close temporarily, except as necessary to engage in minimum basic operations," Colo. Exec. Order No. D 2020-017, at 2 (Mar. 25, 2020), https://www.colorado.gov/governor/sites/ default/files/inline-files/D%202020%20003%20Declaring%20a%20Disaster% 20Emergency_1.pdf [https://perma.cc/7SBC-TTDN]; (2) Executive Order D 2020-003, declaring a disaster emergency due to the presence of coronavirus disease in Colorado, Colo. Exec. Order No. D 2020-003, at 1 (Mar. 11, 2020), https://www.colorado.gov/governor/sites/default/files/inline-files/ D%202020%20003%20Declaring%20a%20Disaster%20Emergency_1.pdf [https:// perma.cc/SJL2-SQL2]; (3) Executive Order D 2020-013, ordering Colorado employers to reduce in-person workforce by fifty percent, Colo. Exec. Order No. D 2020-013, at 2 (Mar. 22, 2020), https://www.colorado.gov/governor/sites/ default/files/inline-files/D%202020%20013%20Ordering%20Colorado% 20Employers%20to%20Reduce%20In-Person%20Workforce%20by%20Fifty% 20Percent_0.pdf [https://perma.cc/HFJ5-S8Y2]; (4) Public Health Order 20-22, closing bars, restaurants, theaters, gyms, casinos, businesses offering non-essential personal services, horse tracks, and off-track betting facilities statewide, Colo. Dep't of Pub. Health & Env't, *Notice of Public Health Order 20-22 Closing Bars, Restaurants, Theaters, Gymnasiums, and Casinos Statewide* (Mar. 16, 2020), https:// covid19.colorado.gov/public-health-orders-and-executive-orders [https:// perma.cc/V7HM-JTMS]; (5) Public Health Order 20-24, directing all Colorado employers, except certain essential businesses, to reduce in-person work by fifty percent and to implement work-from-home capabilities to the extent possible, Colo. Dep't of Pub. Health & Env't, Order No. 20-24, *Implementing Fifty Percent Reduction in Nonessential Business In-Person Work and Extreme Social Distancing* (Mar. 22, 2020), https://drive.google.com/file/d/ 1ndUBYTXVM7yULGMiDPRhjVrUj8qTF2pk/view [https://perma.cc/3LVE-NJVD]; (6) Third Amended Public Health Order 20-28, setting forth requirements for the implementation of Safer at Home, Colo. Dep't of Pub. Health & Env't, Third Amended Order No. 20-28, *Safer at Home* (May 14, 2020), https:// drive.google.com/file/d/1FSR3HMNIZqscMyNjn23j8GhT9xyuwaPp/view [https://perma.cc/F32L-224H]; and (7) Fourth Amended Public Health

19

orders significantly restricted the use of commercial land." The taxpayers argue that the orders required them to shift their business operations because "[n]o customers were allowed to enter the properties"; the taxpayers "were not permitted to enter let alone use their property"; and "'non-critical properties' [could] not be used for any purpose."

¶29 We disagree that the public health orders were "regulations restricting . . . the use of the *land*" under section 39-1-104(11)(b)(I). (Emphasis added.) "Land" is "[a]n immovable and indestructible three-dimensional area." *Land*, Black's Law Dictionary (11th ed. 2019). It is "not the fixed contents of th[e] space . . . , but the space itself." *Id.* (quoting Peter Butt, *Land Law* 9 (2d ed. 1988)). "Land" is therefore distinct from an improvement (such as a building or business) on the land. *See Improvement*, Black's Law Dictionary (11th ed. 2019) (defining "improvement" as "[a]n addition to property, usu[ally] real estate, whether permanent or not; esp[ecially], one that increases its value or utility").

---

Order 20-28, restricting restaurants to fifty percent capacity or fifty people total, whichever is less, for in-person dining, Colo. Dep't of Pub. Health & Env't, Fourth Amended Order No. 20-28, *Safer at Home* (May 26, 2020), https://drive.google.com/file/d/19mjy5vyuLpPcrXz58nK1gWGWUFL4Op_D/view [https://perma.cc/KX7W-D2GJ].

¶30 The tax code reinforces this distinction between land and improvements located on the land. *See, e.g.*, § 39-5-105(1), C.R.S. (2022) (requiring that improvements be valued separately from land); § 39-1-102(14) (listing "[a]ll lands" and "[i]mprovements" in separate subsections in the definition of real property); § 39-1-104(11)(b)(I) (listing as a separate unusual condition the installation of an on-site improvement). As does the ARL. 3 ARL 1.1 (listing "practical reasons for separation of land and improvements" in the Colorado statutes).

¶31 Because "'land' is given a technical meaning and is distinguished from 'improvements'" in the property tax code, this court has previously rejected the invitation to construe "land" in section 39-1-104(11)(b)(I) as synonymous with "improvements." *LaDuke*, 785 P.2d at 609. In *LaDuke*, a steel manufacturing facility "faced with severe financial stress due to the depressed state of the American steel industry" decided to permanently close one of its mills. *Id.* at 606. The issue was whether this shut-down constituted a "change in the use of the land," another unusual condition in section 39-1-104(11)(b)(I). *Id.* We viewed the operation of the steel mill to be use of *improvements on the land*, not use of the *land* itself. *Id.* at 609. As such, we rejected the taxpayer's argument that the assessor was required to consider the shutdown to the steel mill in its valuation. *Id.* at 606. Because "the land was still being used as a site for an industrial plant producing steel," the use of the *land* did not change. *Id.* at 609–10.

¶32 Here, because the public health orders regulated the operation of commercial activity on the land, and not the use of the land itself, they were not "regulations restricting . . . the use of the land" under section 39-1-104(11)(b)(I). It is true that the orders required certain businesses to shift their operations.[4] For example, a Colorado restaurant owner complying with the orders had to "reduce in-person work requirements by fifty percent," Colo. Exec. Order No. D 2020-013, at 1 (Mar. 22, 2020); "offer food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service," Colo. Dep't of Pub. Health & Env't, *Notice of Public Health Order 20-22 Closing Bars, Restaurants, Theaters, Gymnasiums, and Casinos Statewide*, at 5 (Mar. 16, 2020); and later limit reopening to "fifty percent (50%) of their in-office occupancy," Colo. Dep't of Pub. Health & Env't, Third Amended Order No. 20-28, *Safer at Home*, at 20 (May 14, 2020). But critically, these orders did not change how the land itself was being used. The land could still be used to operate a restaurant, even if the public health orders meant such operations became "less intensive." *LaDuke*, 785 P.2d at 610

---

[4] That said, it is not clear that the plaintiff taxpayers were directly affected by the public health orders. In their complaint, the taxpayers do not allege how the public health orders affected each of their specific business operations.

22

("Such a less intensive use of the land does not constitute a change in the use of the land for purposes of section 39-1-104(11)(b)(I).").

¶33　Further, to accept the taxpayers' argument that the public health orders in this case were an unusual condition would lead to absurd results. If the COVID-19 orders were deemed regulations restricting the use of land because they required a temporary closure, then ordinary changes to fire codes affecting occupancy limits or even a routine public health order requiring the temporary closure of a particular restaurant would likewise amount to an unusual condition requiring revaluation of the property. Such an outcome defies legislative intent and is contrary to our holding in *LaDuke*.

¶34　Our conclusion today is bolstered by the ARL. As examples of "regulations increasing or decreasing the use of the land," it lists "changes in zoning; creation of, or changes in, comprehensive land use policies; creation of land set-aside requirements for open space; creation of new flood zones; or any other governmental acts that would affect the ultimate use or disposition of a parcel of land." 3 ARL 1.10. These examples, all involving changes to the categorization of the land, are intended to be permanent until and unless the land is subsequently recategorized. In contrast, the public health orders issued in response to COVID-19 were intended to be temporary. *See, e.g.*, Colo. Exec. Order No. D 2020-011 (Mar. 20, 2020), https://www.colorado.gov/governor/sites/

23

default/files/inline-files/D%202020%20011%20Ordering%20the%20Temporary%20Suspension%20of%20Certain%20Regulatory%20Statutes_0.pdf [https://perma.cc/R67X-3AD7] ("ordering the *temporary* suspension of certain regulatory statutes due to the presence" of COVID-19 (emphasis added)).

¶35   Indeed, we note that the public health orders at issue here were repeatedly clarified, amended, repealed, and re-enacted to adjust to the ever-fluctuating risks of COVID-19. If each such public health order amounted to a regulation restricting the use of land that triggered a mid-cycle revaluation, assessors would have had to revalue every affected property dozens of times in the past two years, a result the legislature could not have intended.

¶36   In sum, we conclude that the public health orders issued in response to COVID-19 did not constitute "regulations restricting . . . the use of the land" under section 39-1-104(11)(b)(I).

## D.  Economic Conditions

¶37   Our conclusion that the COVID-19 pandemic did not constitute an unusual condition is also consistent with case law holding that changed economic conditions are not unusual conditions for purposes of section 39-1-104(11)(b)(I).

¶38   In *Carrara Place, Ltd. v. Arapahoe County Board of Equalization*, 761 P.2d 197, 199 (Colo. 1988), for example, the taxpayer plaintiffs protesting their 1985 property valuations argued that, because vacancy rates and property tax rates were

24

substantially higher in 1985 than in 1976 (the year used to determine the property's value for tax purposes), the assessor should "consider 1985 economic data in making his appraisals."[5] We rejected this argument, observing that a change in economic conditions does not amount to an unusual condition under section 39-1-104(11)(b)(I). *Id.* at 201. As we explained, the legislature "chose to limit revaluation to those cases in which it deemed that a change in the property or in the property's use rendered application of the base year value unjust." *Id.* Thus, although changed economic conditions resulted in the property's value falling below the 1976 value, the assessor was not required to revalue the property to account for the economic downturn. *Id.*

¶39    Similarly, in *LaDuke*, this court reaffirmed that a change in economic conditions does not constitute an unusual condition for purposes of section 39-1-104(11)(b)(I). 785 P.2d at 610. In appealing its 1984 tax assessment, the steel manufacturing facility argued that "the permanent shut-down of a portion of the steel mill and subsequent reduction of 52 percent in the number of its employees constituted an 'unusual condition.'" *Id.* at 608. We disagreed,

---

[5] In *Carrara Place*, assessed values for the 1983 to 1986 tax years were determined with reference to economic conditions in 1976. 761 P.2d at 200. As we explain in *1303 Frontage*, the legislature subsequently amended title 39 to increase the frequency of base year property tax assessments. *See 1303 Frontage*, ¶ 52.

noting that "often there will be significant changes in the intensity of the use of commercial property" between the year the actual value is set and the year of the assessment. *Id.* at 610. But to take into account such changes would negate the reassessment system to which unusual conditions are a limited exception. *Id.*

¶40 Our reasoning in *LaDuke* and *Carrara Place* applies with equal force here. The General Assembly did not list "economic conditions" as an unusual condition in section 39-1-104(11)(b)(I). We cannot smuggle what amounts to a change in economic conditions into section 39-1-104(11)(b)(I) under cover of "any detrimental act[] of nature" or "regulations restricting . . . the use of the land," without contravening the plain language of the statute.

¶41 Doing so would also undermine the advantages the legislature sought to achieve through the tax code it enacted. If we expanded "unusual conditions" in section 39-1-104(11)(b)(I) to include changed economic conditions, taxpayers— unsure which economic fluctuations would trigger a revaluation—would struggle to anticipate their future tax burdens. And in the event of an economic upturn, a taxpayer whose property taxes *increased* in the intervening year would have to shoulder a tax *burden* they could not reasonably have foreseen and for which they were unable to adequately prepare. *See Carrara Place*, 761 P.2d at 204. What's more, assessors would be working incessantly to determine whether changed economic conditions constitute an unusual condition and, if so, to revalue all the

26

properties affected by that changed economic condition. Such constant revaluation would thwart the legislative intent (as well as the stability and predictability) of the two-year reassessment cycle.

¶42 So here, for the reasons set forth in *LaDuke* and *Carrara Place*, the economic impacts of the COVID-19 pandemic are not an unusual condition.[6]

¶43 While the COVID-19 pandemic and public health orders did not trigger section 39-1-104(11)(b)(I)'s revaluation requirement, the tax code accounted—and continues to account—for its economic impact elsewhere. Our legislature enacted a backward-looking reassessment system in which the actual value of a property is based on data from a preceding eighteen-month period. § 39-1-104(10.2)(d). This means the economic impacts of COVID-19 from the first half of 2020, if any, were reflected in the January 1, 2021 tax assessment. *See 1303 Frontage,* ¶¶ 4, 65. And ensuing economic impacts will be reflected in subsequent two-year reassessment cycles. *Id.*; *accord Educhildren*, ¶ 50.

---

[6] Because we conclude that the COVID-19 pandemic and public health orders did not constitute unusual conditions under section 39-1-104(11)(b)(I), the taxpayers' claims fail as a matter of law. Therefore, we need not address the third issue the taxpayers raise contesting the factual support for the district court's conclusion.

# IV. Conclusion

¶44 Although COVID-19 has undoubtedly had negative, wide-ranging, and lasting impacts, it was not a "detrimental act[] of nature," nor were the public health orders passed in response "regulations restricting . . . the use of the land" under section 39-1-104(11)(b)(I). Thus, we affirm the district court's order finding that the taxpayers failed to state a claim for relief and granting the County's motion to dismiss.